In re **LOMBARDO FRUIT AND PRODUCE COMPANY, Debtor.**

**TOM LANGE COMPANY, INC. and Pupillo Brokerage, Plaintiffs,**

v.

**LOMBARDO FRUIT AND PRODUCE COMPANY and Uni–Fin Corporation, Defendants.**

**Bankruptcy No. 89–01101–BSS.
Adv. No. 89–0177–BSS.**

United States Bankruptcy Court, E.D. Missouri, E.D.

Dec. 13, 1989.

## MEMORANDUM OPINION AND ORDER INTRODUCTION

BARRY S. SCHERMER, Bankruptcy Judge.

On July 17, 1989, plaintiff, Tom Lange Company, Inc. (hereinafter "Lange"), filed a complaint against Defendant, Uni–Fin Corporation (hereinafter "Uni–Fin"), seeking to preserve and enforce trust benefits as an unpaid seller of perishable agricultural commodities under the Perishable Agricultural Commodities Act (hereinafter "PACA"), 7 U.S.C. § 499a et seq. Uni–Fin holds a first perfected security interest in all of the Debtor's accounts receivable and proceeds. On November 21 and 22, 1989, the matter was tried before this Court. Uni–Fin claims that Lange failed to comply with the requirements necessary to preserve its trust benefits under the PACA statute and thus is not a short-term creditor within the meaning of the statute.

## JURISDICTION

This Court has jurisdiction over the subject matter of the proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(B).

## FACTS

·Between June 2, 1988 and March 7, 1989, Lange sold $308,895.75 of produce to the Debtor (hereinafter "Lombardo") for which it has not received payment. The above amount is the sum of seventy-seven (77) unpaid invoices. Sixteen (16) of these invoices were part of trading account number 143 (hereinafter "Number 143"). The remaining sixty-one (61) invoices relate to sales made to Lombardo under Lange's trading account number 466 (hereinafter "Number 466"). The balance owed on Number 143 is $63,965.70, while the remaining unpaid balance for Number 466 is $244,930.05.

Stephen P. McCarron, Steven H. Kerbel, Silver Spring, Md., Richard A. Ahrens, David Rubin, St. Louis, Mo., for Tom Lange Co. and Pupillo Brokerage Co.

Scott A. Greenberg, Clayton, Mo., for Gary Lombardo.

David A. Sosne, Clayton, Mo., trustee.

Jerome I. Kaskowitz, Clayton, Mo., Jeffrey Blumenthal, Chicago, Ill., for Uni–Fin Corp.

## I. Number 143

From mid–1986 to July 2, 1988, Lange sold produce to Lombardo under Number 143. All unpaid invoices in controversy under account Number 143 are dated between June 2, 1988 and July 2, 1988. As with all Lange invoices, each of the sixteen in question contained a box entitled "Description of Terms", which set forth the time in which Lombardo had to pay for the products covered by the invoice. All but two of the sixteen invoices state that the terms were "45 DAYS FROM SHIPMENT".

Lange also had the practice of sending its customers weekly statements of account, which reflected outstanding invoices on which the customer had not made payment. The weekly statements reflected both invoices on which payment was currently due and invoices on which payment was overdue and the date after which current invoices became overdue. All of the weekly statements of account issued by Lange in connection with Number 143 from October 15, 1986 to April 25, 1989 stated "INVOICES 45 DAYS PAST INVOICE DATE ARE OVERDUE".

Notwithstanding the terms on the invoices or the weekly statements, Lange contends that its payment terms with Lombardo under Number 143 were thirty (30) days from date of shipment. Lange's contention is premised upon a letter from Lange to Lombardo, dated January 11, 1988, which states that "[o]ur credit terms are net 30 days, on or before, from the date of shipment." The letter was signed as "acknowledged by" William Schulz, Lombardo's President, on January 13, 1988. However, in the twenty-nine (29) years prior to the time that Lombardo ceased business operations, Lombardo rarely paid Lange within thirty (30) days of the invoice date. In fact, between October 15, 1986 and April 25, 1989 (the date of Lange's last weekly statement), in only one of one hundred twenty-two (122) transactions did Lombardo pay Lange within the thirty (30) day period prescribed by the parties' letter agreement.

During the period of June 2, 1988 to July 2, 1988, Lange supplied sixteen (16) loads of produce, for which $63,925.70 remains unpaid. After July 2, 1988, Lange ceased supplying Lombardo due to Lombardo's nonpayment. At that time Lombardo owed Lange $431,674.21. The parties did not resume sale transactions until October 31, 1988. Shortly after its cessation in service, Lange filed three timely trust notices, covering the sixteen (16) loads, with the United States Department of Agriculture (USDA) on July 15, July 28, and August 4, 1988. Lange also sent a copy of the trust notices to Lombardo by registered mail. Lombardo received the notices on the same date or within one day of the date the notices were received by the USDA. The trust notices set forth the shipment date, invoice number, commodity, contract terms, invoice amount, payment due date, and the amount past due.

## II. Sale of the Lombardo Stalls and the Advent of Number 466

After the time that Lange ceased supplying Lombardo with produce, Lange sought ways of alleviating Lombardo's now burgeoning debt, while still allowing Lombardo to continue its produce operations. Thus, on October 28, 1988 Lange purchased from Lombardo's affiliate for $750,000 eleven (11) stalls on Produce Row, from which Lombardo conducted its business. Of the sale proceeds, $150,000 was applied to Lombardo's outstanding balance, $400,000 was disbursed to Uni–Fin, and $200,000 was retained by Lombardo. Lange immediately leased the units back to Lombardo who, with an option to repurchase nine (9) of the stalls, continued with its business operations. Upon the $150,000 payment to Lange, Lombardo maintained an outstanding balance of $127,931.40. In a letter agreement dated October 31, 1988, Lange and Lombardo agreed that beginning November 4, 1988, Lombardo would pay Lange the balance in twenty (20) weekly installments of $6,396.57.

Regarding the value of the stalls, Tom Lange, President of Lange, testified that he had calculated the *average price* of each of the eleven (11) stalls to be approximately

$68,181 (price paid of $750,000 divided by 11 stalls purchased). Uni–Fin, seeking to prove that Lange obtained equity (above the price it paid Lombardo) through the sale, contends that the *average value* of the stalls was closer to $100,000 per stall. Uni–Fin bases this assertion on a sale six months prior to the Lombardo sale in which Lange purchased two stalls on Produce Row from another party for $100,000 each. Mr. Lange testified, however, that the difficulty in selling eleven stalls at one time necessarily decreased the value of the stalls. While the parties may dispute the exact value of the stalls, this Court finds that Lange acquired substantial equity through its purchase of the Lombardo stalls.

Pursuant to the terms of the Lease and Option Agreement, the "Initial Term" was to be for three (3) years. During this period, Lombardo had the option to repurchase nine of the stalls, provided that its entire outstanding balance of payment with Lange was paid in full at the time of closing. If Lombardo did not choose to exercise its purchase option at the end of three years, it had thirty (30) days thereafter to notify Lange that it wished to renew the lease term for an "Extension Term" of three years. The lease obligated Lombardo to pay an annual base rental of $6,818.18 per unit per year (ten percent of the average value of one stall) in monthly installments of $568.18 on the first of each month. Thus, initially Lombardo was obligated as Lange's tenant for at least three years.

After Lange purchased Lombardo's produce stalls, Lange began to resupply produce to Lombardo under new trading account Number 466, which it created solely for bookkeeping purposes. Number 466 effectively enabled Lange to distinguish and differentiate between the old debt (incurred from deliveries between June 2, 1988 and July 2, 1988) and sums which Lombardo would incur subsequent to the purchase of the stalls on October 28, 1988. Thus, upon the creation of Number 466 on October 31, 1988, all Lombardo bills were charged to that account number and Lombardo incurred no further expenses under Number 143, which was to be paid off in weekly installments.

Lange claims that its thirty (30) day credit terms for Number 466 are stated in a letter from Lange to Lombardo, dated December 21, 1988. The copy of the letter produced by Lange is signed by Gary Lombardo but is undated. A duplicate original of the letter maintained in Lombardo's files is also signed by Gary Lombardo and bears a date of "1/6/89" under Mr. Lombardo's signature. Uni–Fin disputes the sufficiency of the terms agreement because it arose well after the date the produce deliveries commenced (October 31, 1988).

After October 31, 1988, Lange supplied sixty-one (61) loads of produce under Number 466, for which $244,345.05 remains unpaid. Identical to its previous practices regarding Number 143, Lange sent Lombardo weekly statements with respect to the alleged outstanding invoices on Account 466. At the bottom of each of the weekly statements for Number 466 appeared the following legend: "INVOICES 30 DAYS PAST INVOICE DATE ARE OVERDUE". Lange filed with the USDA twelve (12) trust notices covering the sixty-one (61) produce transactions on December 9, 22 and 30, 1988, January 5, 13, 19, and 26, 1989, and February 2, 9, 13, 21, and 27, 1989. Lange also sent Lombardo a copy of the trust notices, which Lombardo received on the same day or one (1) day after the USDA received them. The trust notices contained the same information as was set forth with respect to the notices covering Number 143.

### III. The Dishonored Checks

During the course of their transactions, Lombardo sent Lange many checks which were returned for insufficient funds. Upon return, Lange would redeposit the check in the hope that it would then be honored. If the check still did not clear, the bank would refuse to accept a redeposit. In those instances, Lombardo would write Lange a replacement check. Often even this step would fail to help Lange receive payment. For example, in one instance Lombardo wrote three checks

which, after repeated redeposit, failed to clear six times. In another case, one check and its replacement were returned four times for insufficient funds. Finally, in one transaction three Lombardo checks twice failed to clear the bank. Thus, in many cases it was only after great financial maneuvering that Lange was able to obtain payment from Lombardo.

On several occasions Lange's St. Louis office would notify the USDA by letter of its payment by Lombardo, even though Lombardo's checks had not yet cleared the bank. Among other things, the letters advised the USDA of the invoice or the portion thereof being paid, the trust claim notices which had covered the invoices, and the amount of Lombardo's payment. Copies of these letters acknowledging payment were never sent to Lombardo. After Lange received notices of dishonorment for the final time on all replacement checks, it filed with the USDA a trust notice regarding all dishonored checks on March 3, 1989. Lombardo received a copy the notice on the same date.

The parties differ as to the characterization of Lange's letters to the USDA. Uni–Fin claims that such letters constitute "remittance notices" which waive and nullify Lange's claims to any amounts concerned in the letters. Lange contends that notification of the USDA of payment receipt prior to the checks' clearance did not nullify their claim because Lombardo never actually tendered payment to Lange, as required by the PACA statute, and moreover, such notification was merely informational.

### IV. Uni–Fin's Objections

#### A. Number 143

Uni–Fin has asserted several reasons why this Court should preclude Lange from preserving its PACA trust benefits under either Number 143 or Number 466. Regarding Number 143, Uni–Fin first claims that the parties' terms of payment were forty-five days from date of invoice, as stated on both Lange's invoices and its weekly statements. Thus, Lange is precluded from preserving its benefits because such terms are in excess of the thirty days

which the statute allows. Second, Uni–Fin argues that Lange's twenty week extension of Lombardo's payment schedule far exceeds the time period allowed by the statute, thus precluding trust benefit preservation. Finally, Uni–Fin claims that even if Lange and Lombardo set forth thirty day terms of payment which technically complied with the PACA statute, their course of dealing nevertheless should preclude any trust benefit preservation. In effect, Uni–Fin is arguing that the parties' near complete disregard of their thirty (30) day payment terms compels this Court to deny any attempted trust benefit preservation.

#### B. Number 466

Uni–Fin also asserts three reasons why Lange is precluded from preserving its Number 466 trust benefits. First, it argues that in buying Lombardo's stalls and then leasing them back to Lombardo, Lange effectively has transformed itself into a long-term rather than short-term creditor. Because the PACA statute is designed to protect only short-term creditors, Lange is precluded from seeking the protection of PACA by definition. Second, Uni–Fin asserts that by sending its "remittance notices", Lange has waived any possible protection which it previously had with regard to the invoices in those letters. Finally, Uni–Fin argues that the absence of any terms agreement covering Number 466 constitutes a noncompliance with the PACA statute, thereby precluding Lange's trust benefit preservation.

### DISCUSSION

Parts (c)(2) and (c)(3) of 7 U.S.C. § 499e provide, in pertinent part:

(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents

involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association (as defined in section 1141j(a) of Title 12), and its members.

(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and has filed such notice with the Secretary within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accounting, and other documents relating to the transaction.

Thus, under § 499e(c)(3) a produce seller has a given time in which he is to receive payment from the buyer, determined either by statute or the parties' agreement (not to exceed thirty (30) days from delivery). If the seller fails to receive such payment in that time period, he must notify the buyer of his intent to preserve PACA trust benefits and file such notice with the Secretary of Agriculture within thirty (30) days after the time 1) set forth by the Secretary, 2) agreed upon in writing by the parties, or 3) the seller discovers that his promptly presented check has been dishonored.

### I. Number 143

#### A. Terms of Payment

■ Uni–Fin first disputes Lange's contention that the terms of payment between Lange and Lombardo were thirty days from date of invoice. Instead, Uni–Fin argues that the terms were forty-five (45) days from date of invoice, as stated at the bottom of Lange's invoices and weekly statements. Thus, given that the parties' terms were forty-five (45) days, Lange exceeded the thirty (30) day time period allowed by the statute and is precluded from preserving any benefits under Number 143.

This Court concludes 1) that the parties' letter agreement set forth the payment terms as thirty (30) days from invoice date and 2) that technically Lange has complied with the prerequisites necessary to preserve its PACA benefits for Number 143. First, it is clear that Lange and Lombardo agreed in writing to payment terms of thirty (30) days from date of invoice before any of the transactions in question were consummated. It is undisputed that Lombardo received notice of this agreement prior to the transaction. Lange further gave notice of this agreement to the Secretary of Agriculture within thirty (30) days after the payment period was to take place. Second, regarding the forty-five (45) day legend at the bottom of Lange's invoices and weekly statements, the testimony of various Lange employees has proved to this Court that such a legend was merely a standard statement placed at the bottom of all forms. Failure to omit this from the parties' documents was merely an inadvertent mistake which was understood by both Lange and Lombardo. Finally, as this Court has previously stated in *Goldman Fruit & Produce Co. v. Lombardo Fruit & Produce Co.*, 106 B.R. 593 (Bankr.E.D. Mo.1989), a PACA produce seller may not unilaterally place its payment terms at the bottom of its invoices or weekly statements and still preserve its PACA trust benefits. *Goldman* at 600. Instead, "the parties must have *expressly agreed* to the terms of payment in writing" prior to the transaction. *Id.* In sum, it is clear that even if

Lange had wanted to impose the terms stated at the bottom of its invoices and weekly statements, this Court's legal precedent would preclude such an imposition. Thus, for the above reasons, Lange has complied with all of the technical prerequisites enumerated in 7 U.S.C. § 499e(c)(3) which are necessary to preserve PACA trust benefits.

### B. Course of Dealing and Extension of the Payment Period
#### 1. Course of Dealing

■ Under 7 U.S.C. § 499e(c)(3)(ii) produce buyers and sellers may agree, in writing and *before* the first delivery, to payment terms of up to thirty (30) days. In the instant case the parties signed a letter stating that the terms were thirty days from date of shipment. However, as Exhibit A of this Opinion indicates, in only one of one hundred twenty-two (122) transactions under Number 143 did payment take place within that thirty (30) day period. Thus, the parties' course of dealing reflects the fact that the parties' actual payment terms were far in excess of thirty (30) days. This raises the issue of which terms control in this case—those reflected in the parties' agreement or those indicated by their course of dealing. Notwithstanding the parties' written agreement setting forth their payment terms, Uni–Fin argues that the *actual* terms of payment can be determined by the parties' course of dealing.

This Court holds that the parties' terms of payment were dictated by the parties' course of dealing rather than their sham written agreement. An examination of Exhibit A is more than ample evidence to support the finding that while Lange and Lombardo agreed by letter to thirty day terms, neither party adhered to the written agreement. In fact, the parties' written terms were virtually ignored.

Lange contends that so long as the produce buyer and seller technically comply with all of the administrative prerequisites mandated by 7 U.S.C. § 499e(c)(3), their actual course of dealing regarding payment is irrelevant. Therefore, Lange's attempted PACA trust benefit preservation should be honored by this Court. Lange's statutory interpretation, however, effectively renders the parties' written agreement a sham or fraud at best. An adoption of Lange's reading of the PACA statute would allow a produce buyer or seller to superficially comply with the statutory requirements and thereafter completely ignore the payment terms to which they previously agreed. This Court has difficulty believing that Congress, in enacting the PACA statute, ever would have envisioned or promoted such a scheme. In fact, Lange's interpretation directly contradicts Congress' intent regarding the strictness of the thirty (30) day payment term limitation for parties' written agreements. Explaining 7 CFR § 46.46(f), which sets forth the thirty (30) day payment term limitation, the Federal Register states:

> Congress directed the Secretary [of Agriculture] to establish the maximum time by which the parties to a transaction can agree payment must be made and still qualify for coverage under the trust. An agreement for payment after such time will not qualify for trust coverage.

> Current payment practices, as reflected by administrative experience and industry sources, indicate that contracts calling for payment within 30 days from receipt and acceptance of the goods should qualify for trust coverage, and that contracts that call for later payment should not qualify for trust coverage. Therefore, as set forth in § 46.46(f)(2), if an agreement calls for payment 31 days or more after receipt and acceptance of the goods, the trust provisions will not apply to that transaction. 49 *Fed.Reg.* 45735, 45738 (November 20, 1984).

Thus, Congress strictly and expressly provided that parties may not enter into written payment term agreements exceeding thirty days and still preserve their PACA trust benefits. Logically, this prohibition should also extend to parties' course of dealing regarding payment terms. Where a produce buyer and seller enter into a thirty (30) day payment agreement but consistently refuse to honor that agree-

ment through their long course of dealing, the PACA trust provisions should not apply because the *actual* terms of payment have exceeded thirty (30) days. Such a result finds support not only in logic, but also as an established principle of general contract law in the Eighth Circuit. *Federal Express Corp. v. Pan American World Airways*, 623 F.2d 1297, 1303 (8th Cir.1980) (parties may waive a contract through inconsistent course of performance). Thus, this Court rejects the Lange interpretation and holds that in order to preserve its PACA trust benefits, a produce seller and broker who, pursuant to 7 U.S.C. § 499e(c)(3)(ii), agree to written terms of payment before entering into the transaction, must honor those terms in its course of dealing.

As previously stated, all Number 143 invoices were dated between June 2 and July 2, 1988. Thus, at first glance it may appear that Lange was successful in enforcing the thirty (30) day written terms limitation necessary to preserve its Number 143 PACA trust benefits. However, the events that led to the creation of this thirty (30) day period indicate that Lange is not entitled to preserve it Number 143 trust benefits. When Lange purchased Lombardo's eleven produce stalls on October 28, 1988, $150,000 was applied to Lombardo's outstanding $297,372.35 balance, leaving a remaining balance of $127,931.40.[1] All Lombardo payments were applied to the oldest outstanding invoices. This means that after the application of Lombardo's payments on October 31, 1988 to the outstanding debt, all remaining unpaid invoices were fortuitously dated between June 2 and July 2, 1988. Thus, Lange's balance on Number 143 of a thirty (30) day period was merely the serendipitous result of Lange's application of $150,000.00 toward the outstanding Lombardo debt rather than an enforcement of the terms of its written agreement with Lombardo. In light of this fact, Lange may not argue that it has complied with the thirty (30) day written payment term limitation necessary to preserve its PACA trust benefits.

2. Extension of Payment Terms

Uni–Fin also argues that Lange's provision of a twenty (20) week payment plan to enable Lombardo to liquidate the remainder of its Number 143 debt defeats Lange's attempt to preserve its PACA benefits. Such a plan, Uni–Fin contends, basically transforms Lange from a short-term produce creditor to a sort of finance enterprise. Furthermore, an extended payment plan goes beyond the thirty (30) days permitted by PACA. Thus, since PACA was enacted solely to protect short-term creditors, the creation of the extended payment plan removes Lange from the purview of the statute and renders it unable to preserve its statutory trust benefits. However, given this Court's decision that the parties' course of dealing precluded Lange from preserving its Number 143 PACA trust benefits, this Court need not determine whether Lange and Lombardo's agreement to extend payment terms on old, delinquent debt precludes Lange's preservation of its PACA trust benefits.

II. Number 466

Under 7 U.S.C. § 499e(c)(3)(ii), a produce buyer and seller must agree to written terms of up to thirty (30) days before entering into the transaction if they wish their payment terms to be other than the ten (10) days prescribed in part (i) of the same paragraph. Pursuant to part (ii), Lange and Lombardo entered into an agreement on January 13, 1988. However, because the transactions under the new Number 466 involved the same buyer, this Court concludes that the parties did not need a new agreement.[2] Additionally, even if they

---

1. This balance also reflects other payments which Lombardo made concurrently with the $150,000 payment.

2. Mr. Hugh Seelbach, one of Lange's accountants, testified that whenever a new account number is created, such as was the case with Number 466, Lange's computer automatically printed out a new, standard "terms letter", which was then sent to the appropriate customer. This testimony, coupled with the fact that Lange created Number 466 solely for bookkeeping purposes to service the same customer, indicates to this Court that a new terms agreement was both unnecessary and inadvertently sent by Lange.

had needed the agreement, the writing signed on January 13, 1988 would be judged as void under 7 U.S.C. § 499e(c)(3)(ii) because it was entered into *after* the transactions took place.

Given that the second written agreement is both unnecessary and void, this Court must look to the previous written agreement used for the Number 143 transactions in order to determine the actual terms of the Number 466 transactions. However, this Court has ruled that Lange and Lombardo's course of dealing nullified the thirty day terms contained in that letter. Thus, the question remains as to what was the parties' practice after October 31, 1988.

■ Under the agreement covering Lange's purchase of Lombardo's eleven stalls, Lange had a line of credit up to $150,000. Because this amount was effectively secured by the produce stalls, this Court concludes that the parties' October 28, 1988 stall purchase was an open account "secured" by equity. This is evidenced by the fact that Lombardo had a three year option to repurchase its stalls from Lange—an option which it could only exercise if its debt with Lange was paid in full. With this three year option, this Court fails to see how Lange could argue that its payment terms were thirty (30) days from date of invoice. Finally, regarding the applicability of these terms to the Number 466 transactions, this Court takes note of the fact that the agreement was entered into on October 28, 1988—three days *before* the Number 466 transactions commenced. Thus, given that the parties

met the requirements prescribed under 7 U.S.C. § 499e(c)(3)(ii) and the terms of their open account agreement would apply to all Number 466 transactions, judgment shall be entered in favor of Defendant and against the Plaintiff.

### III. The Replacement Checks

Uni–Fin and Lange presented this Court with the issue of whether Lange had adequately preserved its PACA benefits with regard to the replacement checks which it received in some of the Number 466 transactions. However, given that this Court has ruled that Lange may not preserve any of its Number 466 benefits, this Court need no longer consider this issue as any further discussion would simply result in nonbinding *dicta*.

Accordingly, it is ORDERED that Tom Lange and Company is not entitled to preservation of any of its PACA trust benefits under the Perishable Agricultural Commodities Act under either account Number 143 or account Number 466.

This Court previously entered an Order on Uni–Fin's Motion for Summary Judgment in the Pupillo portion of this case, which left for trial five remaining invoices. The parties have advised this Court of the resolution and settlement of that matter. Therefore, the Order of November 9, 1989, 107 B.R. 654, granting summary judgment in favor of Uni–Fin and against Pupillo Brokerage Company is a final order and all issues in this case have now been either ruled upon or settled.

EXHIBIT A

CHART SUMMARIZING COURSE OF
DEALING REGARDING ACCOUNT 143

| DATE OF WEEKLY STATEMENT | SHIPMENT DATE OF FIRST UNPAID INVOICE LISTED ON WEEKLY STATEMENT | NUMBER OF DAYS BETWEEN FIRST UNPAID INVOICE ON WEEKLY STATEMENT AND DATE OF WEEKLY STATEMENT | UNPAID BALANCE LISTED ON WEEKLY STATEMENT |
|---|---|---|---|
| 10/15/86 | 07/24/86 | 83 | $245,313.79 |
| 10/22/86 | 07/24/86 | 90 | 263,400.87 |
| 10/29/86 | 07/24/86 | 97 | 243,028.82 |
| 11/05/86 | 07/24/86 | 104 | 261,903.09 |

| | | | |
|---|---|---|---|
| 11/12/86 | 07/24/86 | 111 | $270,456.34 |
| 11/19/86 | 10/20/86 | 30 | 254,409.68 |
| 11/26/86 | 09/29/86 | 58 | 260,233.81 |
| 12/03/86 | 10/06/86 | 58 | 228,425.30 |
| 12/10/86 | 09/02/86 | 99 | 255,621.48 |
| 12/17/86 | 09/02/86 | 106 | 234,275.71 |
| 12/24/86 | 09/02/86 | 113 | 219,393.84 |
| 12/31/86 | 09/02/86 | 120 | 208,731.94 |
| 01/07/87 | 09/02/86 | 127 | 232,360.54 |
| 01/14/87 | 09/02/86 | 134 | 277,025.60 |
| 01/21/87 | 09/02/86 | 141 | 291,799.41 |
| 01/28/87 | 09/02/86 | 148 | 315,713.41 |
| 02/04/87 | 11/10/86 | 86 | 317,231.95 |
| 02/11/87 | 11/17/86 | 86 | 343,821.07 |
| 02/18/87 | 12/18/86 | 62 | 325,175.43 |
| 02/23/87 | 12/18/86 | 67 | 346,940.98 |
| 03/02/87 | 12/29/86 | 63 | 322,812.90 |
| 03/09/87 | 12/30/86 | 69 | 340,609.55 |
| 03/16/87 | 01/02/87 | 73 | 277,859.65 |
| 03/23/87 | 01/02/87 | 80 | 248,989.60 |
| 03/30/87 | 01/03/87 | 86 | 258,213.45 |
| 04/06/87 | 01/13/87 | 83 | 261,453.20 |
| 04/13/87 | 01/17/87 | 86 | 257,150.00 |
| 04/20/87 | 01/14/87 | 96 | 273,882.21 |
| 04/27/87 | 03/02/87 | 56 | 276,778.33 |
| 05/04/87 | 03/12/87 | 53 | 331,181.49 |
| 05/11/87 | 03/16/87 | 56 | 379,720.09 |
| 05/18/87 | 03/16/87 | 63 | 370,703.99 |
| 05/26/87 | 03/16/87 | 71 | 372,637.54 |
| 06/01/87 | 03/16/87 | 77 | 393,849.66 |
| 06/08/87 | 03/19/87 | 81 | 369,807.76 |
| 06/15/87 | 03/19/87 | 88 | 360,552.85 |
| 06/22/87 | 03/19/87 | 95 | 316,015.53 |
| 06/29/87 | 03/19/87 | 102 | 354,051.92 |
| 07/06/87 | 03/19/87 | 109 | 352,727.92 |
| 07/13/87 | 05/02/87 | 72 | 380,999.87 |
| 07/28/87 | 06/02/87 | 56 | 377,600.90 |
| 08/03/87 | 06/06/87 | 58 | 354,375.75 |
| 08/10/87 | 06/11/87 | 60 | 395,316.25 |
| 08/17/87 | 06/17/87 | 61 | 375,135.18 |
| 08/24/87 | 06/22/87 | 63 | 355,898.63 |
| 08/31/87 | 07/01/87 | 61 | 339,760.48 |
| 09/09/87 | 07/01/87 | 70 | 307,349.48 |
| 09/14/87 | 07/01/87 | 75 | 310,125.39 |
| 09/21/87 | 07/01/87 | 82 | 294,850.63 |
| 09/28/87 | 08/04/87 | 55 | 282,449.78 |
| 10/05/87 | 08/07/87 | 59 | 287,825.88 |
| 10/28/87 | 08/13/87 | 76 | 345,627.65 |
| 11/02/87 | 08/13/87 | 81 | 315,562.35 |
| 11/09/87 | 08/13/87 | 88 | 320,418.19 |
| 11/16/87 | 08/13/87 | 95 | 331,969.20 |
| 11/23/87 | 08/13/87 | 102 | 305,284.20 |
| 11/30/87 | 08/13/87 | 109 | 357,955.45 |
| 12/07/87 | 08/12/87 | 117 | 357,452.20 |
| 01/05/88 | 08/12/87 | 146 | 348,921.37 |
| 01/12/88 | 08/12/87 | 153 | 397,068.62 |
| 01/19/88 | 08/12/87 | 160 | 390,991.37 |
| 01/26/88 | 08/12/87 | 167 | 364,365.12 |
| 02/03/88 | 08/12/87 | 174 | 404,708.12 |
| 02/10/88 | 10/05/87 | 128 | 396,226.12 |
| 02/16/88 | 10/05/87 | 134 | 426,369.33 |
| 02/23/88 | 10/05/87 | 141 | 444,593.19 |
| 03/01/88 | 10/05/87 | 148 | 415,199.42 |
| 03/08/88 | 10/05/87 | 155 | 426,105.37 |

| 03/15/88 | 10/05/87 | 162 | $407,562.92 |
| 03/22/88 | 10/21/87 | 153 | 390,475.42 |
| 03/29/88 | 10/21/87 | 160 | 397,317.06 |
| 04/05/88 | 12/17/87 | 110 | 397,941.51 |
| 04/12/88 | 12/17/87 | 117 | 391,018.13 |
| 04/19/88 | 12/17/87 | 124 | 406,740.83 |
| 04/26/88 | 12/17/87 | 131 | 399,390.93 |
| 05/03/88 | 12/17/87 | 138 | 393,837.43 |
| 05/10/88 | 01/11/88 | 120 | 407,932.98 |
| 05/17/88 | 02/11/88 | 96 | 418,211.26 |
| 05/25/88 | 02/11/88 | 104 | 405,854.46 |
| 06/02/88 | 02/27/88 | 96 | 406,636.51 |
| 06/07/88 | 03/01/88 | 98 | 407,301.61 |
| 06/15/88 | 03/05/88 | 102 | 417,514.51 |
| 06/21/88 | 03/05/88 | 108 | 417,177.01 |
| 06/28/88 | 03/07/88 | 113 | 431,674.21 |
| 07/13/88 | 03/14/88 | 121 | 423,159.15 |
| 07/19/88 | 03/22/88 | 119 | 410,246.65 |
| 07/26/88 | 03/22/88 | 126 | 410,426.65 |
| 08/02/88 | 03/24/88 | 131 | 398,419.12 |
| 08/09/88 | 03/24/88 | 138 | 398,419.12 |
| 08/16/88 | 03/25/88 | 144 | 382,257.22 |
| 08/23/88 | 03/28/88 | 148 | 366,587.17 |
| 08/30/88 | 03/28/88 | 155 | 351,534.17 |
| 09/06/88 | 04/04/88 | 155 | 334,915.42 |
| 09/28/88 | 04/11/88 | 170 | 302,372.35 |
| 10/04/88 | 04/11/88 | 176 | 302,372.35 |
| 10/11/88 | 04/11/88 | 183 | 297,372.35 |
| 11/01/88 | 05/16/88 | 169 | 127,931.40 |
| 11/08/88 | 05/20/88 | 172 | 121,534.83 |
| 11/15/88 | 05/20/88 | 179 | 115,138.26 |
| 11/22/88 | 05/27/88 | 179 | 108,741.69 |
| 11/29/88 | 06/01/88 | 182 | 102,345.12 |
| 12/06/88 | 06/01/88 | 189 | 95,948.55 |
| 12/13/88 | 06/01/88 | 196 | 95,948.55 |
| 12/20/88 | 06/02/88 | 202 | 89,551.98 |
| 12/28/88 | 06/02/88 | 210 | 85,860.41 |
| 01/04/89 | 06/02/88 | 217 | 79,463.84 |
| 01/10/89 | 06/02/88 | 223 | 63,965.70 |
| 01/17/89 | 06/02/88 | 230 | 57,569.13 |
| 01/24/89 | 06/02/88 | 237 | 51,172.56 |
| 01/31/89 | 06/02/88 | 244 | 51,172.56 |
| 02/07/89 | 06/02/88 | 251 | 51,172.56 |
| 02/14/89 ** | 06/02/88 | 258 | 51,172.56 |
| 02/21/89 | 06/02/88 | 265 | 51,172.56 |
| 02/28/89 | 06/02/88 | 272 | 51,172.56 |
| 03/07/89 | 06/02/88 | 279 | 63,965.70 |
| 03/14/89 | 06/02/88 | 286 | 51,172.56 |
| 03/21/89 | 06/17/88 | 278 | 38,242.25 |
| 03/28/89 | 06/17/88 | 285 | 38,242.25 |
| 04/04/89 | 06/17/88 | 292 | 38,242.25 |
| 04/11/89 | 06/17/88 | 299 | 38,242.25 |
| 04/18/89 | 06/17/88 | 306 | 38,242.25 |
| 04/25/89 | 06/17/88 | 313 | 38,242.25 |

** Lombardo ceased active operations on or about February 11, 1989. Notwithstanding that, Tom Lange Company continued to issue weekly statements of account for Account Number 143.

EXHIBIT B
CHART SUMMARIZING COURSE OF
DEALING REGARDING ACCOUNT 466

| DATE OF WEEKLY STATEMENT | SHIPMENT DATE OF FIRST UNPAID INVOICE LISTED ON WEEKLY STATEMENT | NUMBER OF DAYS BETWEEN FIRST UNPAID INVOICE ON WEEKLY STATEMENT AND DATE OF WEEKLY STATEMENT | UNPAID BALANCE LISTED ON WEEKLY STATEMENT |
|---|---|---|---|
| 11/01/88 | 10/28/88 | 4 | $ 10,507.65 |
| 11/08/88 | 10/17/88 | 22 | 25,639.20 |
| 11/15/88 | 10/17/88 | 29 | 59,895.01 |
| 11/22/88 | 10/17/88 | 36 | 67,189.31 |
| 11/29/88 | 10/28/88 | 32 | 69,644.51 |
| 12/06/88 | 10/28/88 | 39 | 102,457.01 |
| 12/13/88 | 10/31/88 | 43 | 86,787.00 |
| 12/20/88 | 11/09/88 | 41 | 107,981.21 |
| 12/28/88 | 11/16/88 | 42 | 96,506.45 |
| 01/04/88 | 11/14/88 | 51 | 143,119.45 |
| 01/10/89 | 10/31/88 | 71 | 138,838.20 |
| 01/17/89 | 11/18/88 | 60 | 134,819.60 |
| 01/24/89 | 11/18/88 | 67 | 167,205.25 |
| 01/31/89 | 11/18/88 | 74 | 184,855.50 |
| 02/07/89 | 11/18/88 | 81 | 196,009.55 |
| ** | | | |
| 02/14/89 | 11/18/88 | 88 | 196,009.55 |
| 02/21/89 | 11/18/88 | 95 | 196,009.55 |
| 02/28/89 | 11/18/88 | 102 | 196,009.55 |
| 03/07/89 | 10/31/88 | 128 | 244,930.05 |
| 03/14/89 | 11/17/88 | 118 | 206,733.65 |
| 03/21/89 | 11/18/88 | 124 | 204,797.35 |
| 03/28/89 | 11/18/88 | 131 | 204,797.35 |
| 04/04/89 | 11/18/88 | 138 | 204,797.35 |
| 04/11/89 | 11/18/88 | 145 | 204,797.35 |
| 04/18/89 | 11/18/88 | 152 | 204,797.35 |
| 04/25/89 | 11/18/88 | 159 | 204,797.35 |

** Lombardo ceased active operations on or about February 11, 1989. Notwithstanding that, Tom Lange Company continued to issue weekly statements of account for Account number 466.