**In re DAVIS DISTRIBUTORS, INC. (Two Cases).**

**WILSON MUSHROOM COMPANY, Plaintiff–Appellee,**

**v.**

**DAVIS DISTRIBUTORS, INC.; Sovran Bank, N.A., Defendants–Appellants (Two Cases).**

**Nos. 88–2076, 88–2077.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1988.

Decided Nov. 15, 1988.

Rehearing Denied Dec. 9, 1988.

James Robert Schroll (Bean, Kinney, Korman & Moore, P.C., Arlington, Va., Herbert Rosenblum, Alan Rosenblum, Rosenblum & Rosenblum, P.C., Alexandria, Va., Bennett A. Brown, Gilliam, Sanders and Brown, Fairfax, Va., on brief), for defendants-appellants.

Bryan T. Veis (Peter L. Wellington, Paul P. Andrews, Steptoe & Johnson, Washington, D.C., on brief), for plaintiff-appellee.

Before WINTER, Chief Judge, and PHILLIPS and SPROUSE, Circuit Judges.

JAMES DICKSON PHILLIPS, Circuit Judge:

Davis Distributors, Inc. (Davis), a Chapter 11 debtor, appeals an order granting relief from the automatic bankruptcy stay, 11 U.S.C. § 362(a), to Wilson Mushroom Company (Wilson), which had supplied produce to Davis and is one of Davis' largest creditors. The district court found that Wilson was entitled to priority as to some estate assets over Davis' other creditors as the beneficiary of a "statutory trust" arising under the provisions of the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. §§ 499a–499s. Concluding that Wilson was disqualified to claim protection of the PACA trust because the credit it extended to Davis was for periods in excess of the limits imposed by the PACA regulations, 7 C.F.R. § 46.46, we reverse.

I

Prior to the filing of its Chapter 11 petition (since converted to Chapter 7), Davis was a licensed dealer of mushrooms and other produce to supermarkets, restaurants and other retail establishments. Wilson is

a wholesaler and "jobber" of mushrooms. Over a seven-year period beginning in 1980, Wilson regularly supplied Davis with substantial quantities of mushrooms.

Wilson shipped mushrooms to Davis on credit, invoicing amounts due with each shipment. Davis typically made payment on the invoices between thirty and sixty days after each shipment, but fell progressively further behind in payment of its aggregate account balance with Wilson. After 1983, Davis never owed Wilson less than $300,000 on accumulated unpaid invoices, many of which had "aged" considerably.

In the summer of 1986, Wilson's management learned that Davis was experiencing significant financial difficulties. Wilson apparently wished to continue its business relationship with Davis, but was concerned that Davis' large account balance was unsecured. In an effort to assure Wilson that Davis would fulfill its obligations with respect to past and future sales, the parties executed a written Security Agreement (the Agreement) on October 23, 1986. The Agreement gave Wilson a security interest in Davis' inventory and accounts receivable, and also governed the parties' continuing credit relationship.

In executing the Agreement, Wilson claims now to have sought not only to obtain tangible collateral for the Davis account, but also to preserve its rights to the benefits of a "statutory trust" under the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. §§ 499a–499s. In a 1984 amendment to PACA,[1] Congress had provided for the imposition of a trust on certain assets of a defaulting buyer of perishable agricultural commodities[2] in favor of sellers supplying the produce on a "cash" or "short-term credit" basis.[3] 7 U.S.C. § 499e(c)(2).[4] There are a number of procedural and substantive prerequisites to securing the protection of a PACA trust, the specifics of which the statute leaves largely to the regulatory discretion of the Department of Agriculture. *Id.,* § 499e(c)(3).[5] For example, potential trust beneficiaries must file timely notices with the Department of their claims to PACA trust benefits. *Id.; see also* 7 C.F.R. § 46.46(g).

Relevant in the present case are the PACA regulations designed to insure that a produce supplier seeking the protection of the statutory trust is indeed a "short-term" creditor. PACA requires that buyers make "full payment promptly" for all merchandise received from produce suppliers, 7 U.S.C. § 499b(4), and imposes civil liability on buyers who default on their payment obligations. *Id.,* § 499e(a). In most cases, buyers must pay for shipped commodities within ten days after receipt of the produce. *See* 7 C.F.R. § 46.2(aa). Buyers and sellers may agree to allow more time, but must reduce any such agreement to writing. *Id.,* § 46.2(aa)(11). None of these provisions, of course, directly implicate a seller's eligibility for the protection of the PACA statutory trust. The regulations further provide, however, that "[t]he maximum time for payment for a shipment to which a seller, supplier, or agent can agree *and still qualify for coverage under the trust* is 30 days after receipt and acceptance of the commodi-

---

1. Pub.L. No. 98–273, § 1, 98 Stat. 165 (1984).

2. PACA defines "perishable agricultural commodity" as "[f]resh fruits and fresh vegetables of every kind and character," 7 U.S.C. § 499a(4)(A), which of course include mushrooms.

3. *See* H.R.Rep. No. 543, 98th Cong., 2d Sess. 6–7, 12, *reprinted in* 1984 U.S.Code Cong. & Admin.News 405, 410, 415 (report of House Agriculture Committee on PACA amendments).

4. Section 499e(c)(2) provides, in relevant part:
    Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. . . .

5. The Department's regulations governing PACA statutory trusts are set out at 7 C.F.R. § 46.46 (1988).

ties." 7 C.F.R. § 46.46(f)(2) (emphasis supplied).

Herein lies the heart of the present dispute. Wilson began filing notices under 7 C.F.R. § 46.46(g) on December 11, 1986, thereby asserting affirmatively its claim to the protection of a PACA trust. Davis argues, however, that Wilson was ineligible for trust benefits *ab initio*, because the parties' Security Agreement unambiguously provided for a "maximum time for payment" of outstanding obligations that *exceeded* thirty days. At issue are paragraphs two and three of the Agreement:

2. *Credit Terms.* Seller hereby agrees to extend further credit to Buyer upon Buyer's purchase of mushrooms from Seller, subject to the following limitations: (i) Buyer's account with Seller shall at no time exceed a total of Three Hundred Fifty Thousand ($350,000.00) Dollars; and *(ii) Buyer shall pay all invoices in full within thirty (30) days of the date of the invoice.* In the event that Buyer's account balance exceeds the foregoing limitation *or if Buyer fails to pay any invoice in full within sixty (60) days of the date of such invoice, Buyer shall be in default under this Agreement, and Seller shall be entitled to exercise all of the remedies set forth herein, as well as any remedies which may be available at law or in equity,* and especially any and all remedies available under Article 9 of the Uniform Commercial Code.

3. *Notice and Demand.* In the event that Buyer is in default under its account with Seller, Seller shall, prior to instituting any formal legal proceedings or collection action against Buyer, notify Buyer, in writing, that Buyer is in default under the terms of this Agreement, specifying the nature of the default and demanding payment of all overdue invoices and any other sums of money necessary to cure Buyer's default. *If Buyer fails to cure its default and pay the entire sum demanded within five (5) business days following its receipt of Seller's notice of default and demand for payment, then Seller shall be entitled to exercise all remedies made available to him under this agreement and under any applicable law.* (Emphasis added.)

Davis argues that the quoted provisions expressly permit payment at any time prior to the passage of sixty days after receipt of a shipment, noting that "default" is postponed for sixty days and that Wilson cannot compel payment under the Agreement, by legal means or otherwise, until sixty days have passed. Wilson responds by emphasizing that the Agreement expressly requires that Davis "shall pay all invoices in full within thirty (30) days of the date of the invoice." Wilson characterizes the sixty-day postponement of default as a "grace period," during which Wilson will defer execution on its security. Wilson argues, however, that this consensual forbearance does not relieve Davis of its responsibility to make payment within thirty days.[6]

This dispute over the "time for payment" embodied in the parties' credit relationship (and, in turn, over Wilson's eligibility for PACA trust benefits) crystallized shortly after Davis filed its Chapter 11 petition. Wilson filed a motion in the bankruptcy court seeking relief from the automatic stay, 11 U.S.C. § 362(a), and an order compelling Davis to pay Wilson $365,550.55 as benefits of a PACA trust. The bankruptcy court denied the motion, holding that the Security Agreement by its terms allowed Davis to satisfy its obligation under invoices at any time prior to the expiration of *sixty* days after receiving a shipment of mushrooms. Thus, Wilson failed to comply with the PACA regulations' "maximum time for payment" provision and disqualified itself from the protection of the PACA trust. On Wilson's appeal, the district

6. Davis argues, in the alternative, that the contractual language is at least ambiguous, requiring the consideration of extrinsic evidence of the parties' intent with respect to "time for payment." Davis also suggests that, even if the Agreement unambiguously requires satisfaction of unpaid invoices within thirty days, Wilson waived the protection of the payment provision in the "course of performance." In light of our disposition of the central interpretive question, however, we need not reach these claims.

court reached precisely the opposite conclusion, holding that the Agreement unambiguously required payment within *thirty* days. The court analogized the Agreement's provision deferring default to a "grace period" under a deed of trust and suggested that, while the contractual language postponed Wilson's right to execute on its collateral, it did not defer Davis' underlying thirty-day payment obligation.[7]

## II

We need do no more in this case than interpret the disputed terms of a contract.[8] The question is whether the parties' Security Agreement provides for a "maximum time for payment" exceeding thirty days, thereby disqualifying Wilson from the protection of the PACA statutory trust.

We start with the settled rule that "interpretation of a written contract is a question of law subject to *de novo* appellate review." *Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir.1984). Our independent reading of the parties' Agreement leads us to conclude that the district court erred in holding that Davis was contractually required to make payment for each shipment within thirty days.

The language in paragraph two of the Agreement, to the effect that Davis "shall pay" for all shipments within thirty days, cannot be read in isolation. We must look to the contract *as a whole* to determine how it speaks with respect to the time within which Davis functionally is obliged to make payment. Reading the relevant provisions together, one cannot escape the conclusion that there simply is no practical significance whatsoever to any failure by Davis to remit payment within thirty days. The Agreement explicitly postpones, until sixty days have passed, not only Davis' actual "default" but also Wilson's right to exercise *any* of its legal or equitable remedies. As a result, and from either party's perspective, it makes no difference whether

Davis chooses to wait fifteen or fifty-nine days after receiving a shipment before remitting payment. Reading the Agreement as written, Davis would know that, for up to sixty days, it could delay payment with impunity; likewise, Wilson would know that it could do nothing during this time to recover the debt.

A contract simply cannot be read to "require" payment within thirty days if it explicitly postpones default *and* all of the attendant consequences for sixty days. Read as a whole, the parties' Security Agreement gives Davis sixty days to pay for each new shipment of produce.

Wilson invokes the general rule of contract interpretation that "a construction which would render the provision of a contract of doubtful validity is to be avoided, if another reasonable construction can be placed upon it." *Newport News Shipbuilding & Drydock Co. v. United States*, 226 F.2d 137, 142–43 (4th Cir.1955). While our interpretation of the Agreement indeed casts doubt on the validity of the discrete "shall pay" language on which Wilson relies, Wilson has not offered "another reasonable construction" to trigger the *Newport News* rule. The district court gave effect to the thirty-day payment provision in isolation, and held that the sixty-day deferral of default merely postponed Wilson's right to execute on its security. The court argued that, in this sense, the sixty-day deferral was a "grace period" analogous to the postponement of foreclosure under a deed of trust for some fixed period after payment grows overdue on an underlying promissory note. We decline to accept Wilson's invitation to adopt the district court's position or its characterization of the Agreement's practical effect. The contract in question does far more than provide for a period of forbearance on Wilson's right to realize on its collateral; it forecloses *all* attempts to exercise legal and equitable remedies for sixty days. If the Agreement were truly akin to a deed of

---

7. The bankruptcy and district courts reached their (contrary) conclusions on the basis of the "plain meaning" of the Agreement, and did not consider the extrinsic evidence of the parties' intent proffered by Davis. *See* note 6, *supra*. ·

8. It is not disputed that, if Wilson's claim qualifies for PACA trust protection, it thereby has priority over all other claims and is entitled to relief from the automatic stay.

trust, Wilson could sue on the asserted contractual obligation immediately after thirty days had passed, notwithstanding its obligation to wait thirty additional days before executing on the security. This contract, however, forces Wilson to watch the mail for sixty days before taking *any* action. Even then, Wilson can only give "notice of default," and must wait an additional five days, while Davis is given an opportunity to cure, before filing suit or attempting to realize on the collateral.[9]

Rather than simply deferring Wilson's right to execute, this Agreement postpones default itself and Wilson's right to exercise *any* remedy.[10] The Agreement cannot reasonably be interpreted, therefore, to "require" payment within thirty days.[11] To the extent that some language in the Agreement thus appears to be superfluous, the draftsmen may be left to wonder at the difference between what they may have intended and what the contract unambiguously says.

### III

For these reasons, we hold that Wilson was not eligible for the protection of the PACA statutory trust. The contrary judgment by the district court is reversed and the case is remanded for entry of an order consistent with this opinion.

REVERSED and REMANDED.

---

9. The "cure" and "notice of default" provisions in paragraph three of the Agreement might easily be characterized as "grace period" terms, suggesting the additional difficulty that, under Wilson's interpretation, the contract inexplicably provides for *two* "grace periods."

10. In its brief, Wilson suggests that we hold that, after thirty days, "Davis was in default by operation of law." Appellee's Brief at 21. We fail to see how we can so hold when the Agreement expressly *postpones* default for sixty days.

   Even if the Agreement did not expressly defer default, the result would be the same. Definitionally, "default" refers to the time at which an injured party becomes entitled to exercise his remedies.

11. The district court may have misapprehended the nature of the Agreement's default-deferral provision and believed that the Agreement in fact merely postponed Wilson's rights to execute on underlying collateral. In a colloquy with counsel, the court summarized its understanding of the relevant provisions as follows: "[T]he agreement itself says that you are not relegated solely to the remedies provided by this agreement. You could go sue on this indebtedness on the 31st day, and not be in contravention of this agreement." Joint Appendix on Appeal at 61–62 (transcript of district court hearing). Later, explaining Wilson's obligations: "We agree that we will not undertake to realize on our security for 60 days, but that doesn't obviate your obligation to pay it in 30 days." *Id.* at 62. Contrary to the district court's apparent understanding, however, the Agreement expressly withdraws Wilson's right to be "standing at the courthouse door," or indeed to do anything, "on the 31st day."