HILLER CRANBERRY PRODUCTS, INC., Plaintiff, Appellant,

v.

Edward M. KOPLOVSKY, Koplovsky Foods, Inc., and Clermont, Inc., Defendants, Appellees.

No. 98–1398.

United States Court of Appeals, First Circuit.

Heard July 29, 1998.

Decided Jan. 4, 1999.

2

Evan Slavitt, with whom Andrew A. Honegger, Benjamin G. Robbins and Gadsby & Hannah LLP were on brief, for appellant.

John J. Monaghan, with whom Gordon P. Katz, Paul G. Lannon and Sherburne, Powers & Needham, P.C. were on brief, for appellees.

Before TORRUELLA, Chief Judge, WELLFORD,* Senior Circuit Judge, and SELYA, Circuit Judge.

* Of the Sixth Circuit, sitting by designation.

WELLFORD, Senior Circuit Judge.

We are confronted in this case with difficult issues involving the interpretation of the Perishable Agriculture Commodities Act of 1930, 7 U.S.C. § 499a, *et seq.* ("PACA"). Plaintiff Hiller Cranberry Products, Inc. ("Hiller"), entered into a supply agreement (the "Supply Agreement") with Koplovsky Foods, Inc. ("KFI"), which is owned by Edward Koplovsky ("Koplovsky"), whereby Hiller was to sell KFI 33% of its cranberry crop from 1996 through 1998. After the delivery of about $7 million in cranberries in the fall of 1997, KFI failed to pay approximately $4.4 million of the agreed purchase price. Hiller sued KFI, Clermont, Inc. ("Clermont"), and Koplovsky in district court, alleging state-law breach of contract and misrepresentation claims, and also a federal claim under PACA. Hiller sought a preliminary attachment, but the district court found that only a partial attachment was appropriate. This is an appeal from that determination. For the following reasons, we reverse in part the district court's decision.

## BACKGROUND

Hiller is in the business of selling cranberries, those that are grown by the Hiller family and also those obtained from other growers on Cape Cod in Massachusetts. Defendant KFI is a Massachusetts company that purchases raw fruit from third-party growers to be sold to processors for the production of, among other things, fruit juice concentrate. Defendant Clermont is an Oregon corporation with its principal place of business in Duxbury, Massachusetts. Clermont processes raw produce into fruit juice concentrate. For many years, Hiller has done business with Edward M. Koplovsky, the president and sole shareholder of both KFI and Clermont. Until 1996, business between Hiller and Koplovsky occurred on a handshake basis.

On or about September 10, 1996, KFI entered into the written Supply Agreement to purchase one-third of Hiller's Massachusetts-grown cranberries in 1996, 1997, and 1998.

The agreed-upon purchase price was $90 per barrel subject to certain price adjustments. Under the Agreement, KFI agreed to pay 75% of the purchase price within ten days of the invoice date, with the remainder payable in two equal installments on January 1 and February 1 of the following year.

Between September 25 and November 25, 1997, KFI accepted delivery of nearly seven million dollars of Hiller's cranberries. KFI owes Hiller an outstanding balance of $4,225,455.58, plus interest, on the cranberries. Hiller also agreed to clean some cranberries for KFI, for which it charged $215,038.49. Thus, KFI, now bankrupt, owes Hiller a total of $4,440,494.07.

Upon the purchase of the cranberries from Hiller, KFI immediately sold them to Clermont. Indeed, Koplovsky arranged for shipment of the Hiller cranberries directly from Hiller to Clermont's facilities in New York. Thus, KFI merely served as a broker or conduit for Clermont. Clermont, in turn, immediately pledged the Hiller cranberries to its lender to secure a multi-million dollar loan. Clermont used only a fraction of the loan proceeds to pay for the cranberries, and it used the rest to pay Mr. Koplovsky and other creditors of Koplovsky and his companies.[1]

When it was apparent that no additional payment was forthcoming from KFI, Hiller made demand for the immediate payment of the outstanding balance due under the Agreement on or about December 1, 1997. Despite alleged assurances from Koplovsky, KFI failed to pay Hiller the outstanding balance. On or about December 5, 1997, Hiller filed a Notice of Intent to Preserve Trust Benefits with the United States Department of Agriculture and sent a copy of the notice to KFI. That filing purported to set forth a priority claim under PACA.

On March 11, 1998, still having received no payment, Hiller filed suit in district court against Koplovsky individually, KFI, and Clermont for damages arising from the failure to pay the approximately $4.4 million due for the cranberries and cranberry services. Hiller sought a declaration that (1) very large quantities of cranberries were subject to a PACA trust, (2) each defendant had committed unfair and deceptive acts within the meaning of PACA, and (3) that the defendants had breached the fiduciary duties imposed by PACA. Hiller claimed, among other things, that Clermont and Koplovsky were liable for KFI's debts under PACA and as "alter egos" of KFI. In addition, Hiller claimed that Koplovsky was engaged in a course of conduct calculated to conceal assets and to deprive creditors of access to these assets. It alleged that Koplovsky transferred substantial real property, including his cranberry bogs in Plymouth County, Massachusetts, to various limited partnerships for a nominal sum ($1). Though Koplovsky had explained the transfers as "estate planning," they occurred in the midst of the cranberry price decline and during the time KFI was failing to pay Hiller.

At the outset of the lawsuit, the court granted Hiller an *ex parte* temporary restraining order ("TRO") preventing the defendants from disposing of any assets other than in the ordinary course of business. On March 18, 1998, the parties stipulated to a TRO, a preliminary injunction, and attachments against all the defendants pending further order of the court. Later, the district court heard oral arguments regarding Hiller's motion for the issuance of a preliminary injunction and writ of attachments against all of the defendants, and also regarding the potential liability of Clermont and Koplovsky under PACA and as alter egos of KFI.

On April 9, 1998, the district court issued an order granting a preliminary injunction against KFI and continuing the writs of attachment in the amount of $4,440,494.07 upon all the assets of KFI. The order also enjoined Clermont as a "reach-and-apply" defendant

---

1. The purported reason for Clermont's inability to pay KFI was that as of October 31, 1997, Ocean Spray—the industry giant and price setter—had lowered the price that it was charging for cranberry juice concentrate from $80 per unit to $60 per unit. As a result, the market price of cranberry juice concentrate fell drastically, and the bulk of Clermont's inventory was lowered in value by $20 per unit. This event rendered Clermont unable to meet its financial obligations, including its obligations to KFI. Because Clermont did not pay KFI, KFI could not pay Hiller.

from paying any amount due to KFI and enjoined KFI from receiving any of its approximately $10 million receivable from Clermont. The court did not at that time grant Hiller a preliminary injunction and a writ of attachment against Koplovsky individually.

In a memorandum dated April 17, 1998, the district court addressed the potential liability of Clermont and Koplovsky individually. *Hiller Cranberry Prods., Inc. v. Koplovsky Foods, Inc.*, 2 F.Supp.2d 157 (D.Mass. 1998). First, the court found that Hiller would not likely succeed on its PACA claim against Clermont and Koplovsky, because the Supply Agreement allowed for 25% of the purchase price to be paid outside the thirty-day limitation imposed by PACA. *Id.* at 160–61. Also, the district court found that Hiller was not likely to succeed under an "alter ego" theory against either Clermont or Koplovsky. *Id.* at 161–64. The district court specifically found that the evidence weighed against piercing the corporate veil of KFI because there was no evidence that corporate funds had actually been appropriated for personal use, nor was there evidence that Hiller had been misled as to the separate identities of the defendants. *Id.* Finally, the district court determined that the complaint was not sufficiently specific to support the state law claims, but that, even if the complaint were sufficient, no federal subject matter jurisdiction existed absent a valid claim under PACA. *Id.* at 164–65.

Hiller appealed and simultaneously moved the district court to stay its order pending appeal. The district court denied the motion to stay but allowed a temporary stay so that Hiller could request a stay from this circuit. We then granted a stay pending an appeal, effectively reinstating the original attachments and injunctions which precluded the defendants from transferring assets except in the normal course of business. The defendants subsequently filed an emergency motion for reconsideration of the stay pending appeal. We denied that motion for reconsideration, but ordered an expedited briefing schedule.

### ANALYSIS

 This court "will reverse a district court's denial of a preliminary injunction only if the district court abused its discretion." *American Bd. of Psychiatry & Neurology, Inc. v. Johnson–Powell*, 129 F.3d 1, 2–3 (1st Cir.1997) (citing *Camel Hair & Cashmere Institute of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12–13 (1st Cir. 1986)). The district court's decision to grant or deny a preliminary injunction is reviewed by this court "under a relatively deferential glass," because decisions to grant or deny injunctive relief "can best be made by trial courts steeped in the nuances of a case and mindful of the texture and scent of the evidence." *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988); *K–Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989). "Absent clear error or other abuse of discretion, we will not reverse a district court's denial of an injunction merely because we would have been inclined to grant the injunction had we heard the matter ourselves." *American Bd. of Psychiatry*, 129 F.3d at 3. We review *de novo*, on the other hand, the district court's construction of PACA and its other conclusions of law. *See In re Altabon Foods, Inc.*, 998 F.2d 718, 719 (9th Cir.1993).

As indicated above, Hiller sought a preliminary injunction against the defendants restricting all transfer of assets except in the ordinary course of business, and it also sought a prejudgment attachment on the defendants' assets. In order to obtain either form of relief, Hiller was obligated to prove a likelihood of success on its various claims. In denying Hiller the relief requested, the district court found that Hiller would not likely succeed against Clermont or Koplovsky on its claims under PACA, nor would it succeed against those defendants under an "alter ego" theory. For the reasons explained hereunder, we reverse those findings in part and remand to the district court for further proceedings consistent with this opinion.

### A. Likelihood of Success Against Clermont and Koplovsky Under PACA

 In 1984, Congress amended PACA by creating a statutory trust over any goods,

receivables, or proceeds from perishable agricultural commodities until the buyer makes full payment. 7 U.S.C. § 499e(c). The commodities, receivables, or proceeds "shall be held by such commission merchant, dealer or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents." 7 U.S.C. § 499e(c)(2). In essence, PACA creates a trust in favor of the seller of the unpaid goods which is superior to the interest of the buyer's secured lender. *See Sanzone–Palmisano Co. v. M. Seaman Enterprises, Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993). One result is that the *res* of the trust is subject to the seller's lien and never becomes part of the buyer's estate in the event of the buyer's bankruptcy. *In re W.L. Bradley Co., Inc.*, 75 B.R. 505, 512 (Bkrtcy. E.D.Pa.1987).

■ To preserve benefits under a PACA trust, a supplier of perishable agricultural goods must deliver written notice of his intent to preserve trust benefits to the debtor and to the United States Secretary of Agriculture within a certain period of time.[2] PACA establishes a ten-day time period within which a PACA seller is to be paid (*see* 7 C.F.R. § 46.2(aa)(5)), but parties may extend the time period for payment by written agreement up to thirty days without negating the PACA trust provisions. Any agreement extending the payment period beyond thirty days generally constitutes a waiver of rights under the PACA trust. Title 7 C.F.R. § 46.46(e)(2) provides that "[t]he maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities." *Id.*

■ The circumstances in the instant case are unique, because the Hiller Supply Agreement requires that 75% of the purchase price be paid within ten days of acceptance, but

allows for 25% of the purchase price to be paid more than thirty days after acceptance. Whether an agreement providing for partial payment within the thirty-day requirement and partial payment outside that time period constitutes complete waiver of PACA protections is an issue of first impression in the federal courts. Every other court that has addressed the applicability of the PACA trust has dealt with *total* amounts due under an agreement for delivery of perishables within or outside the thirty-day requirement.

The district court found that Hiller completely waived all rights to trust protection under PACA by allowing for partial payment beyond the thirty-day requirement. In reaching that conclusion, the court relied on cases which have upheld the thirty-day period as the maximum limit for payment. *See In re Lombardo Fruit and Produce Co.*, 12 F.3d 806, 809 (8th Cir.1993); *In re Altabon Foods, Inc.*, 998 F.2d 718, 720 (9th Cir.1993); *In re Davis Distributors, Inc.*, 861 F.2d 416, 417–18 (4th Cir.1988); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.*, 819 F.Supp. 209, 211 (E.D.N.Y.1993). Although the district court found this case to be analogous to *In re Lombardo* and *In re Altabon,* it recognized that the Supply Agreement in the instant case "var[ied] slightly" from the contracts in the other cases because of this Agreement's "partial payment" provision. The court looked to the regulations which define "full payment promptly" as "specifying the period of time for making payment without committing a violation of the act." 7 C.F.R. § 46.2(aa). The court reasoned that "'full payment promptly' in connection with the 'maximum time for payment' in Section 46.46(e)(2) indicates ... that the entire payment must be made within the thirty-day period. In order, thus, to be eligible for the protection of the PACA statutory trust, the written agreement must comply with PACA's maximum payment terms." *Hiller Cranberry Prods., Inc.*, 2 F.Supp.2d at 161.

**2.** Notice must be given within 30 calendar days of three specified events, two of which were relevant in the instant case:

 (i) after expiration of the time prescribed by which payment must be made, [or] (ii) after

expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction....

7 U.S.C. § 499e(c)(3).

Hiller argues that it did not waive its rights under the PACA trust, at least with respect to 75% of the contract price.[3] Though there are no cases that have interpreted PACA so as to provide for partial rights in this context, Hiller claims that the remedial nature of the statute dictates that this court construe the statute liberally in light of its remedial purpose to afford trust protection to qualifying sellers. *See Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777 (8th Cir.1991); *Continental Fruit Co. v. Thomas J. Gatziolis & Co.,* 774 F.Supp. 449 (N.D.Ill. 1991); *In re Richmond Produce Co.,* 112 B.R. 364 (Bkrtcy.N.D.Cal.1990). Hiller contends that because the Supply Agreement provided for *partial* extension of the payment term, then Hiller's waiver, if any, of its PACA trust rights should be viewed as only *partial* in nature.

KFI responds that Hiller's positions are unfounded, and that the thirty-day requirement for "full payment promptly" is consistent with PACA's purposes. KFI points out that, in a related proceeding, a district court in New York has adopted the district court's analysis of the Supply Agreement in question and has determined that no PACA protection is available to Hiller. *Hiller Cranberry Prods., Inc. v. Koplovsky,* 5 F.Supp.2d 89 (N.D.N.Y.1998). In fact, the New York court did adopt the conclusion of the district court in the instant case, but it relied almost entirely on the same analysis. *See id.* at 91–92. Thus, we give that decision little weight in reaching our ultimate conclusion.

■ Congress created the availability of the PACA trust to address burdens on commerce arising out of financing arrangements between sellers and buyers of produce:

[A] burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and ... such arrangements are contrary to the public interest. This [Act] is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1). Thus, PACA is a remedial statute that should be given a liberal construction in favor of promoting Congress' intended purpose.[4] *See Hull,* 924 F.2d at 782. Guided by the general principle that we should construe this legislation in a liberal manner, we consider whether PACA covers the Supply Agreement in the instant case.

As indicated above, the district court found this case to be analogous to *Lombardo* and *Altabon.* In *Lombardo,* the parties had entered into a written contract for the sale of produce providing for the payment of the purchase price within PACA's thirty-day limitation. In the parties' course of dealing, however, the seller sometimes allowed the buyer to pay outside the thirty-day window. Thus, the buyer's secured creditor argued in bankruptcy proceedings that the written agreement was a sham, and that by allowing the buyer to pay outside the thirty days the seller lost its protection under PACA. The issue before the court was whether the par-

---

**3.** Hiller also argued in its brief that its explicit waiver was only a *contingent* waiver, and that when KFI failed to pay the 75% within ten days, Hiller's timely notice and demand for the entire amount due "constituted a proper revocation of the extended payment term." Hiller seems to drop this argument in its reply brief: "The Court may well find that the extension of 25% of the purchase price beyond thirty days was a partial waiver of PACA trust protection for that [25%] portion." It also failed to pursue this argument at the oral argument before this panel. In any event, we reject this "contingency" argument

and, as will be discussed below, we find that Hiller has waived PACA trust protection for 25% of the total invoice price.

**4.** The dissent is of the view that the language of PACA unambiguously precludes coverage of divisible transactions, and that resort to this canon of statutory construction is unnecessary. *See post* at p. 12. We respectfully disagree with that premise, because we find that the statute is unclear and that it did not expressly contemplate the situation in the instant case.

ties' course of dealing was relevant in determining whether the seller was entitled to trust protection. The court held that the contract was valid and enforceable, even though the parties may not have strictly operated under its terms. The court recognized, however, that the seller could qualify for PACA protection with respect to those transactions for which timely notice had been given. To allow the seller in that case to recover for only those transactions supported the sole purpose of PACA, which "is to protect sellers of fresh produce for payment of their accounts from the assets derived from the sale of the purchased produce in case of bankruptcy, liquidation or other financial distress as against the claims of secured creditors."[5] *Lombardo,* 12 F.3d at 811.

In *Altabon,* the seller and buyer of produce entered into several contracts that provided for payment periods of 45–60 days. After the buyer filed for bankruptcy, the seller filed its notice of its intent to seek trust protection under PACA. The buyer's creditor filed an action seeking to determine the rights of the parties, and argued that the seller could not avail itself of PACA's trust protections because the contract between the parties contained payment periods in excess of thirty days. The court found that the thirty-day maximum imposed by Congress was reasonable and was a permissible construction of the statute. *Altabon,* 998 F.2d at 720.

We have no disagreement with the holdings in *Lombardo* or *Altabon.* We do not find, however, the reasoning in those cases to be determinative of the issue at bar. Similarly, we do not find controlling other cases in which the thirty-day limitation was upheld and enforced. *See In re Davis Distributors,* 861 F.2d 416 (4th Cir.1988) (refusing to allow imposition of the PACA trust provisions when contract allowed 60 days for payment); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.,* 819 F.Supp. 209 (E.D.N.Y.1993) (finding that the written contract satisfied PACA's provisions, despite the fact that the

parties' course of dealing may have allowed for a longer payment term).

In each of the cases cited above, the courts focused on the payment terms of the written contract between the parties and found that the written agreement was controlling. In the instant case, the terms of the Supply Agreement are clear—75% of the payment is due within PACA's thirty-day limitation and 25% is due outside that time period. The question is whether allowing for such a payment scheme negates in total the statutory trust provisions, or whether the PACA protection was preserved as to 75% of the Agreement.

We are persuaded that construction of PACA in a strict and unbending fashion would erode the trust protections PACA was meant to provide. The statutory language in PACA itself does not address the situation in the instant case where a contract explicitly provides for partial payments both within and outside PACA's thirty-day requirement. Furthermore, there is no guiding precedent directly on point.

Though there are no cases addressing the applicability of PACA in a "part-payment" situation, there are a plethora of cases that are instructive as to the purposes and intent of PACA. In *Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777 (8th Cir.1991), the court sets out well the general purposes and operation of the Act:

> Congress ... amended PACA in 1984 to provide additional protection to produce sellers. Congress recognized that, under the prevailing law, "sellers of fresh fruits and vegetables [were] unsecured creditors and receive[d] little protection in any suit for recovery of damages where a buyer ha[d] failed to make payment as required by the contract." H.R. Rep. at 407. The statutory amendments make a legislative finding that financing arrangements made by commission merchant dealers and brokers who have not made payment for the goods deprive suppliers of payment and

---

5. The dissent views the sellers' advantage under PACA as merely an incidental benefit. *See post* at p. 12. While we agree that the regulatory purpose of the law is to relieve a burden on commerce, such relief is effectuated by giving

sellers the direct benefit of the PACA trust to the extent that their transactions qualify for such protection under the applicable regulations. A number of cases recognizes this important remedial benefit.

disserve the public interest. 7 U.S.C. § 499e(c)(1).

Congress remedied this situation by amending PACA to make produce sellers' interests in the commodities superior to those of the buyers' secured creditors. Under the amendments, buyers of perishable agricultural commodities are now required to hold the purchased commodities, and any resulting proceeds, in trust for the benefit of the sellers until the sellers are paid in full. 7 U.S.C. § 499e(c)(2). The statutory history indicates that the trust imposed on the assets of a buyer of perishable commodities related to those supplying credit on a short term basis. *In re Davis Distributors, Inc.*, 861 F.2d 416, 417 (4th Cir.1988). Congress left the specifics to the regulatory discretion of the USDA, including the task of prescribing the time "by which payment must be made." 7 U.S.C. § 499e(c)(3).

*Id.* at 780, 781 (footnote omitted). The Eighth Circuit then proceeded to the following conclusion about the construction of the Act:

[R]emedial legislation should be given a liberal construction to effectuate its statutory purpose. *International Nutrition v. United States Dep't of Health*, 676 F.2d 338, 341 (8th Cir.1982); *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). Here, the PACA amendments serve to "provide suppliers and sellers of fruits and vegetables, or their agents, [with] a self-help tool that will enable them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables." 49 Fed.Reg. 45,735, 45,737 (1984).

*Id.* at 782. We agree with *Hull Co.* and believe that plaintiff has complied with PACA requirements as to 75% of the total contract; our decision does not "thwart the remedial nature of the statute." *Id.* at 783; *see also In re W.L. Bradley Co., Inc.*, 75 B.R. 505, 511 (Bkrtcy.E.D.Pa.1987) (resolving ambiguities of PACA in favor of the seller and

being "guided by the general legislative intent to establish increased production and an effective remedy for sellers, suppliers and agents."); *O'Day v. George Arakelian Farms*, 536 F.2d 856, 857–58 (9th Cir.1976) (stating that the principal purpose of PACA is "to provide a practical remedy to small farmers and growers who were vulnerable to the sharp practices of financially irresponsible and unscrupulous brokers in perishable commodities." (citation omitted)); *Continental Fruit Co. v. Thomas J. Gatziolis & Co.*, 774 F.Supp. 449 (N.D.Ill.1991) ("PACA is a remedial statute, and it is a long-established principal [sic] of statutory construction that remedial statutes are to be construed liberally.").

One of the factors that we deem to weigh in favor of Hiller in this case is the clarity with which the Supply Agreement provided that KFI was to pay 75% of the amount within the statutory thirty days and then, upon this three-quarters fulfillment of its written commitment, the remaining 25% was to be paid at some time after thirty days. This arrangement constituted a partial waiver of PACA rights by Hiller. The parties contemplated by their Agreement that KFI was bound to pay 75% of the total price for the cranberries within ten days. Consistent with the purposes of the Act, we conclude that the arrangement under consideration was equivalent to a sale of 75% of the cranberries with payment to be made for these berries within ten days thereafter.

In sum, we find that Hiller is eligible for PACA protection with respect to 75% of the Supply Agreement.[6] This finding, however, does not conclude the relevant inquiry. Whether Clermont is liable as a PACA broker, or whether Koplovsky is liable as a PACA trustee, are issues that require further consideration by the district court. The court should be mindful of the effect of the imposition of the PACA trust:

PACA establishes a statutory trust for the benefit of sellers and suppliers. This trust arises from the moment perishable goods are delivered by the seller. An

---

**6.** The defendants do not argue that Hiller did not otherwise fully comply with PACA notice, de-

mand and other procedural requirements.

individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act. This legal framework is to be distinguished from the piercing the veil doctrine, where the corporate form is disregarded because the individual has either a committed a fraud, or because the corporation is a "shell" being used by the individual shareholders to advance their own purely personal rather than corporate ends. *Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131 (2d Cir. 1991). We find persuasive the reasoning holding a fiduciary liable for breach of trust under PACA.

We recognize at the outset that a PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier. This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities. Proceeds from the sale of perishables subject to PACA receive special treatment in other respects as well. Thus, a PACA beneficiary has priority over any secured creditor on the purchaser's commodity-related assets to the extent of the amount of his claim.

*Morris Okun, Inc. v. Harry Zimmerman, Inc.,* 814 F.Supp. 346, 348 (S.D.N.Y.1993) (citations omitted); *see also In re Baird,* 114 B.R. 198, 204 (9th Cir. BAP 1990) (finding that "an officer who causes a corporate trustee to commit a breach of trust causing loss to the trust administered by the corporation is personally liable to the beneficiaries for the loss").

Thus, we reverse and remand to the district court to assess the potential liability of either Clermont or Koplovsky under PACA.

## B. Likelihood of Success Against Clermont and Koplovsky on Theories of Alter Ego and Piercing KFI's Corporate Veil

Hiller argued that Clermont should be held liable as the alter ego of KFI, and that the corporate veil of KFI should be pierced to hold Koplovsky personally liable for KFI's debts. The district court rejected these claims against Clermont and Koplovsky, and concluded that Hiller was unlikely to succeed on these "alter ego" theories.[7] Consequently, the court dissolved the injunctions against those defendants.

Although the district court noted that "[i]t is undisputed that Edward M. Koplovsky exercises pervasive control over" KFI and Clermont, it found this factor insufficient to support the alter ego theory, and declined to pierce the corporate veil of either KFI or Clermont. The basis for this decision was that there was "no failure to make clear which corporation was taking action nor any failure to observe with care the corporate form." As pointed out by the district court, the Hiller–KFI Agreement specifically identified only KFI as the buyer, and concluded with the following sentence, added by Koplovsky, which amended a broader provision proposed by Hiller: "By executing this Agreement, Clermont, Inc. and Edward M. Koplovsky, together with any other entities under their control, hereby join in the obligations of Buyer under *Section 5.3* hereof [an agreement not to solicit berries from any other source but Hiller]."

We cannot find the facts as determined by the district court to have been erroneous with respect to piercing the corporate veil or alter ego liability. Neither can we conclude that the district court misinterpreted Massachusetts law in this regard. A recent Massachusetts case has cited controlling authority on these issues and has concluded:

> In order for a court to disregard separate corporate entities, a plaintiff must meet a very high standard. *American*

---

**7.** As the district court noted, "[t]he doctrine is known by various names, including 'piercing the corporate veil,' 'disregarding the corporate entity,' and the 'alter ego' theories." *Hiller Cranberry Products, Inc.,* 2 F.Supp.2d at 161 n. 3. The various references are all used to indicate an individual shareholder's responsibility for the acts of the corporation, or to indicate one corporation's responsibility for the acts of another corporation.

*Home Assurance Co. v. Sport Maska, Inc.,* 808 F.Supp. 67, 73 (D.Mass.1992). Under Massachusetts law, disregarding separate corporate entities is the exception, not the rule, . . . . A court may pierce a corporate veil only when there is evidence of a "confused intermingling between corporate entities or where one corporation actively and directly participates in the activities of the second corporation, apparently exercising pervasive control." *American Home,* 808 F.Supp. at 73.

*Dale v. H.B. Smith Co., Inc.,* 910 F.Supp. 14, 18 (D.Mass.1995). In formulating the Supply Agreement, Hiller contracted to incorporate Koplovsky and Clermont for the sole purpose of their committing not to solicit berries from Hiller's independent grower competitors during the term. Clermont and Koplovsky made clear from the outset that they were not parties to the general Supply Agreement.

For these reasons and for the reasons stated by the district court, we affirm the court's determination that Hiller will not likely succeed against Clermont or Koplovsky pursuant to "alter ego" theories of liability.

## C. Likelihood of Success on Claims of Misrepresentation and Fraudulent Conveyance

■ The district court ruled that there was no reasonable likelihood of success against Koplovsky individually on the claims of misrepresentation. As one basis for this determination, the court noted that there was no federal subject matter jurisdiction in this case because the PACA claim failed. As heretofore determined, the district court was in error in reaching its conclusion on the merits of the PACA claim. We have also remanded for further consideration as to whether Koplovsky may be liable as a trustee under the circumstances of this case. We deem the misrepresentation claim to be related to the potentiality of trustee liability. In discussing misrepresentation, we have recognized that "the element of fraudulent intent may be proved by showing that a defendant made a statement 'as of [his] own knowledge' that was false." *Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 5 (1st Cir.1984) (quoting *Snyder v. Sperry &*

*Hutchinson Co.,* 368 Mass. 433, 333 N.E.2d 421, 428 (Mass.1975)). Reliance upon such statement might also be shown. In light of the circumstances, we cannot at this juncture hold that Hiller has not alleged a sufficient claim of misrepresentation against Koplovsky, whether acting individually or as a trustee. Thus, we reverse the dismissal of that claim and **remand** for its further consideration.

We also remand to the district court Hiller's fraudulent conveyance claim because we cannot agree that there may not be a reasonable likelihood of success against Koplovsky individually on one or more of those claims. The district court will, therefore, on remand, hold a hearing to determine the issues remaining in light of our opinion.

In summary, we reverse the district court's determination that Hiller is ineligible for PACA protection with respect to 75% of the Supply Agreement. We remand to the district court for further proceedings consistent with this opinion to determine the likelihood of success against Clermont and Koplovsky under PACA. We affirm the district court's determination that Hiller is unlikely to succeed on its claim that Clermont and Koplovsky are liable under "alter ego" theories. We reverse, however, the district court's dismissal of the claims of misrepresentation and fraudulent conveyance and remand for further consideration in light of this opinion.

Under the circumstances, we deny defendant Koplovsky's motion to dissolve the stay of the district court's order. Since we remand certain issues involving Koplovsky to the district court, defendant is not precluded from renewing his motion in that court provided such relief is consistent with this opinion.

SELYA, Circuit Judge (dissenting).

As the majority correctly notes, this appeal involves a difficult question of statutory construction that constitutes an issue of first impression in the federal courts. Because I read the statutory imperative differently than my colleagues, I respectfully dissent.

A core feature of the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c)(1)-(4) (Supp. II 1996) (PACA), impresses a trust in favor of the supplier of a covered agricultural commodity. Under the statute and the associated regulations promulgated by the Secretary of Agriculture, that trust is superior to the interests of a purchase-money lender (or any other security interest, for that matter) as long as the transaction meets certain criteria and the trust beneficiary takes certain specified actions. *See* 7 C.F.R. § 46.46(e)(1)-(2) (1996). For example, to qualify for trust protection, the terms of sale must call for payment within ten days of the date of acceptance of a particular shipment. *See* 7 C.F.R. § 46.2(aa)(5)(1986). This period may be extended up to a maximum of thirty days by an express written agreement executed prior to the time of shipment, but cannot be extended for any more protracted period. *See* 7 U.S.C. § 499e(c)(3); 7 C.F.R. § 46.46(e)(2). The plaintiff does not challenge either the efficacy of this regulation or the Secretary's authority to set the thirty-day limit.

The supply agreement at issue in this case is a hybrid: it requires that 75% of the purchase price for each shipment be paid within ten days after acceptance of that shipment (i.e., within the PACA-prescribed payment period), but defers payment of the remainder of the purchase price for more than thirty days (i.e., to a date beyond the PACA-prescribed payment period). The question, then, is whether the transaction is divisible for PACA purposes. If so, the plaintiff, *qua* supplier, can claim the benefit of the trust for that part of the payment (here, 75%) which falls within the statutorily prescribed period. If, however, the transaction is indivisible for PACA purposes, the statute would not apply because "[t]he maximum time for payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the [PACA] trust is 30 days after receipt and acceptance of the commodities." 7 C.F.R. § 46.46(e)(2).

The majority today decides that individual transactions are, in fact, divisible for this purpose. In my view, the contours of the trust itself, as framed by the statute, do not seem elastic enough to permit such a construction. Commodities sold pursuant to the act "shall be held ... in trust for the benefit of all unpaid suppliers or sellers ... until *full payment of the sums owing in connection with such transactions* has been received." 7 U.S.C. § 499e(c)(2) (emphasis supplied). It is difficult for me to fathom how a partial payment of the purchase price for a particular shipment can constitute "full payment of sums owing in connection with" that shipment. The majority's holding reads the concept of "full payment" out of the statute. Basic canons of construction prohibit courts from taking such liberties. *See United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 751-52 (1st Cir.1985) ("All words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

The regulations reinforce the view that the statute constructs an all-or-nothing paradigm. They unambiguously provide that any circumstance that extends the payment period "for a shipment" beyond thirty days constitutes a waiver of any entitlement to the benefits of a PACA trust. *See* 7 C.F.R. § 46.46(e)(2) (declaring that "[t]he maximum time for payment *for a shipment* to which a seller, supplier, or agent can agree and still qualify for coverage under the [PACA] trust is 30 days after receipt and acceptance of the commodities") (emphasis supplied). Courts ought to attribute to an undefined word in a statute or regulation its ordinary usage. *See Bailey v. United States*, 516 U.S. 137, 145, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). Under this approach, the regulation determines PACA eligibility shipment by shipment. I simply do not believe that this emphasis on the unitary conception of "a shipment" is an awkward locution. The regulation, as I read it, means exactly what it says—and we ought to give effect to its meaning. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("We have long recognized that considerable weight should be accorded to an

executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.").

In sum, the statute and the regulations clearly indicate that transactions cannot be balkanized in order to obtain partial PACA protection. The case law, while scanty, trends in the same direction. Those courts that have addressed claims involving payment terms of more than thirty days uniformly have held PACA inapplicable on the ground that the thirty-day maximum period is to be imposed as written. *See In re Lombardo Fruit & Produce*, 12 F.3d 806, 809 (8th Cir.1993); *In re Altabon Foods, Inc.*, 998 F.2d 718, 720 (9th Cir.1993); *In re Davis Distributors, Inc.*, 861 F.2d 416, 417–18 (4th Cir.1988); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.*, 819 F.Supp. 209, 211 (E.D.N.Y.1993). Today's decision represents the first break in this seamless string of decisions. And although none of these cases is precisely on point, in cumulation they furnish a persuasive set of analogs. The district court embraced this analogy, *see Hiller Cranberry Prods., Inc. v. Koplovsky Foods, Inc.*, 2 F.Supp.2d 157, 160–61 (D.Mass.1998), and I believe it had good reason to do so.

The majority overrides the logical import of the statute, regulations, and case law on the ground that "PACA is a remedial statute that should be given a liberal construction...." *Ante* at 6. I have two problems with this usurpation. First, statutory construction starts with the statutory text, read in light of applicable regulations. *See Riva v. Commonwealth of Mass.*, 61 F.3d 1003, 1007 (1st Cir.1995); *Strickland v. Commissioner, Me. Dep't of Human Servs.*, 48 F.3d 12, 17 (1st Cir.1995). Where, as here, Congress has spoken to an issue with reasonable clarity, there is little room left for judicial rumination. *See Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992); *Riva*, 61 F.3d at 1007. Put another way, an inquiring court need not consult other aids to construction when the words of a statute, as embellished by the implementing regulations, neither create an ambiguity nor lead to an unreasonable result. This is such a case—and in such circumstances, a euphemistic label cannot serve as a magic wand to transform statutory meaning.

Second, the majority misperceives Congress's purpose. In enacting the PACA, Congress sought to strike a balance between the interests of growers and the interests of those who purchase perishable commodities from them. As written, the law in effect provides that growers who sell their crops for cash retain a security interest in the crops if payment is not made when due, while those who extend significant credit to buyers forgo such protection. This arrangement balances the seller's right to payment against the buyer's need to finance its operations, thus serving the public interest by alleviating the "burden on commerce," 7 U.S.C. § 499e(c)(1), with which PACA's progenitors were primarily concerned. The remedy that PACA crafts for growers is merely incidental to the overall regulatory purpose of the law.

I need go no further. The short of it is that Congress and the Secretary of Agriculture have made reasonably clear their intention to treat each shipment of perishable goods as a unit for the purpose of determining that shipment's eligibility for PACA protection. By like token, Congress and the Secretary have made "full payment" an integral part of the test for eligibility. By permitting a grower to divide a single shipment into discrete units in accordance with the terms of an installment sale, and divide the payment accordingly, the majority here disrupts the symmetry of the statutory scheme. I think that the court, in charting such a course, invites untold mischief. Because I read the statute and regulations differently—and more literally—I would reject the plaintiff's appeal in its entirety.