**CONTINENTAL FRUIT CO., Plaintiff,**

v.

**THOMAS J. GATZIOLIS & CO., INC., William T. Gatziolis, Alex D. Moglia and Midwest Bank & Trust Co., Defendants.**

**No. 91 C 3375.**

United States District Court, N.D. Illinois, E.D.

July 25, 1991.

**450**

Michael T. Reid, Halfpenny, Hahn & Roche, Chicago, Ill., Jeffrey R. Sonn, Richard L. Katz, Richard L. Katz Law Office, Coral Gables, Fla., for plaintiff.

Abraham J. Zenoff, Alan H. Zenoff, Zenoff, Zenoff & Ehrenberg, Chicago, Ill., for defendants.

## ORDER

BRIAN BARNETT DUFF, District Judge.

The parties are before this court on plaintiff's motion for a preliminary injunction. The motion is fully briefed and the court conducted a hearing at which the parties argued their positions and presented evidence on July 12, 1991. The court, having heard the arguments and considered the memoranda and evidence submitted in this matter, is now prepared to rule on the pending motion.

### Facts [1]

Continental Fruit Co. and the Gatziolis company had a business relationship which began in January, 1990 and ended in May, 1991 when Gatziolis assigned all of its as-

---

**1.** The parties' dispute centers on the legal interpretation of facts to which, for the most part, they agree. The court's recitation of facts is, unless otherwise noted, limited to those upon which the parties agree.

sets to Alex D. Moglia for the benefit of its creditors, with the agreement that Moglia will liquidate Gatziolis' assets and distribute the proceeds (less Moglia's fee) to Gatziolis' creditors.

During the course of their relationship, Continental made nearly a hundred shipments of produce to Gatziolis. Gatziolis has not paid for the last eight of those shipments and owes Continental $74,108. There is no evidence in the record indicating that Continental and Gatziolis had a formal agreement regarding payment terms. However the course of dealing between the parties, as evidenced by Gatziolis' records (which the parties agreed are accurate), demonstrates that, of the shipments for which Gatziolis paid, approximately fourteen percent were paid within thirty days. Nearly eighty percent were paid within forty days.

Gatziolis kept its business account at Midwest Bank and Trust Co. The uncontroverted testimony at the hearing on this matter indicated that all the proceeds of its sales of commodities (including those delivered by Continental) were deposited in that account. Gatziolis also had a loan with Midwest. When Gatziolis notified its creditors, including Midwest, of its assignment for the benefit of creditors, Midwest immediately set-off the money on deposit in Gatziolis' bank account and applied it to Gatziolis' loan obligation.

Continental claims that Congress has granted it an interest superior to that of Midwest and Gatziolis' other creditors, and seeks an order from this court enjoining any further dissipation of Gatziolis' assets and requiring all the defendants to relinquish those assets they have already taken from the Gatziolis estate.

### Discussion

■ The statute upon which Continental relies is the Perishable Agricultural Commodities Act (PACA), 7 U.S.C. § 499a et seq. (1984). Congress first enacted the statute in 1930 to regulate the interstate and foreign shipment and handling of perishable agricultural commodities. It amended the statute in 1984 to add § 499e(c) which provides that a buyer of perishable agricultural commodities holds the produce and any related inventory and accounts receivable in trust for the benefit of all the buyer's unpaid sellers. Congress passed the amendment because it found that:

> [A] burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products and that such arrangements are contrary to the public interest. This [Act] is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1) (1984). PACA § 499e(c)(2) provides that:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and *any receivables or proceeds from the sale of such commodities or products,* shall be held by such [entity] in trust for the benefit of all unpaid suppliers or sellers of such commodities ... until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers.... (Emphasis added).

Trust assets are to be maintained in a nonsegregated, floating trust, and may be commingled with non-trust assets. 7 C.F.R. part 46.46(c). Those holding trust assets must maintain them so that they are "freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 U.S.C. § 499b.

Sellers of PACA commodities do not automatically qualify for the broad protection

of the Act, however. Rather, the Act provides that:

> The unpaid supplier, seller, or agent shall lose the benefits of [the] trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker and has filed such notice with the Secretary [of Agriculture] within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary [ten days after the day on which the produce is accepted—7 C.F.R. part 46.2(aa)(5)], (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction [not to exceed 30 days from the date of receipt of the goods—7 C.F.R. part 46.-46(f)(2)].... When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accounting, and other documents relating to the transaction.

7 U.S.C. § 499e(c)(3) (1984).

Thus, at the least, a seller or supplier has forty days from the date the shipment is received to notify the Secretary and receiver of its intent to preserve benefits under the PACA trust. If the parties have formally agreed to a payment period of more than ten but less than thirty days, the seller or supplier has thirty days from the expiration of that period to give proper notice.

The defendants argue that Continental and Gatziolis had, through their "course of dealing" established a payment term in excess of thirty days and that, therefore, Continental is not entitled to the benefits of the PACA trust. They cite *In re Lombardo Fruit and Produce Co.*, 107 B.R. 952 (E.D.Mo.1989) in support of their argument. In *Lombardo*, the parties had a written agreement in which they agreed to a thirty-day payment period. The plaintiff filed the PACA trust notices based upon the thirty day payment period (that is, within sixty days of the date of delivery of the produce). Citing the Federal Register explanation for the requirement that payment terms not exceed thirty days,[2] the court held that the parties' course of dealing, rather than a "sham" written agreement, established the payment period. Since the course of dealing was to permit payment "far in excess" of thirty days, the court held that the seller was not entitled to PACA trust protection.

This court finds that the *Lombardo* holding is not applicable here for two reasons. First, Continental did not rely on extraneous payment terms in timing its notification regarding PACA trust assets. Rather, it filed its notice within forty days of the date of delivery, in compliance with § 499e(c)(3)(i) and 7 C.F.R. part 46.2(aa)(5). Second, PACA is a remedial statute, and it is a long-established principal of statutory construction that remedial statutes are to be construed liberally. See *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 552, 19 L.Ed.2d 564 (1967); *Hull Co. v. Hauser's Foods, Inc.*, 924 F.2d 777, 782 (8th Cir.1991) (PACA is "remedial legisla-

**2.** "Congress directed the Secretary to establish the maximum time by which the parties to a transaction can agree payment must be made and still qualify for coverage under the trust. An agreement for payment after such time will not qualify for trust coverage.

"Current payment practices, as reflected by administrative experience and industry sources, indicate that contracts calling for payment within 30 days from receipt and acceptance of the goods should qualify for trust coverage, and that contracts that call for later payment should not qualify for trust coverage. Therefore, as set forth in § 46.46(f)(2), if an agreement calls for payment 31 days or more after receipt and acceptance of the goods, the trust provisions will not apply to that transaction." 49 Fed.Reg. 45735, 45738 (1984).

The Federal Register also provides, however, that the 1984 amendments (including current § 499e(c) were intended to "provide suppliers and sellers of fruits and vegetables, or their agents, [with] a self-help tool that will enable them to protect themselves against the abnormal risk of losses resulting from slow-pay and no-pay practices by buyers or receivers of fruits and vegetables." 49 Fed.Reg. 45735, 45737 (1984).

tion [which] should be given a liberal construction to effectuate its statutory purpose."); *In re Richmond Produce Co.*, 112 B.R. 364, 370 (Bkrtcy.N.D.Cal.1990) (liberally construing timing requirements for filing PACA notices).

■ With these principles in mind then, the court considers whether a preliminary injunction is appropriate in this matter. The standard governing the court's decision is well established. The court must consider four questions:

1. Whether the plaintiff has an adequate remedy at law or will suffer irreparable harm if the injunction does not issue;

2. Whether the balance of harms favors issuance of the injunction;

3. Whether the plaintiff has a likelihood of success on the merits; and

4. Whether the issuance of the injunction would serve the public interest.

*International Kennel Club, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). No one of these factors is dispositive, nor need Continental make a strong showing on each factor—rather, the court must evaluate the factors on a "sliding scale". *Id.*

### 1. Adequate Remedy/Irreparable Harm

Continental argues that, without some action by this court, Continental has no assurance that Moglia and Midwest will not dissipate assets—in contravention of PACA and to Continental's permanent detriment (since it appears that Gatziolis had only limited assets). As to the funds which Midwest used to set off Gatziolis' loan obligation, the bank argues that there is no irreparable harm to Continental if it maintains those funds in one account (a PACA trust account) or another (as a bank asset) until this court makes a final ruling.

■ Midwest's argument that only money is at stake and that the potential harm

to Continental is therefore not irreparable might be persuasive in the absence of the PACA statute. The statute, however, alters the terrain substantially. Congress specifically found that it creates a substantial burden on commerce when a produce buyer gives a lender a secured interest in produce (or its byproducts) for which the seller has not yet been paid. See 7 U.S.C. § 499e(c)(1). A small seller (and produce sellers are, Congress · found, frequently smaller concerns) can be hurt quickly and lethally when even one buyer reneges on its obligations. Thus, the potential harm to Continental, the seller, is significant. Congress specifically singled out this potential harm for special protection with the PACA statute. This court is accordingly persuaded that Continental stands to suffer irreparable harm if it is not granted expeditious relief.

### 2. Balance of Harms

This factor weighs clearly in Continental's favor. If the money is not segregated, Continental may never be paid for the produce it has already delivered to Gatziolis. The only harm which Midwest has alleged is the inconvenience of changing its records to reflect the change in the status of the money. That is hardly a substantial harm, nor one particularly onerous to a bank. The court therefore finds that the balance of harms favors issuance of the injunction.

### 3. Likelihood of Success on the Merits

■ As the court noted above, the fact that many of Gatziolis' payments to Continental were made more than thirty days after Gatziolis accepted the produce, Continental has nonetheless established its right to PACA trust protection by filing its notices within forty days of delivery.[3] Having established that it is entitled to PACA trust protection, Continental has proven its likelihood of success in this matter. The interest of PACA trust beneficiaries

---

**3.** There is one exception to the court's statement that Continental's notices were timely: one of the deliveries for which Continental is seeking PACA trust protection occurred more than forty days before Continental filed its notices. The invoice amount for that delivery was $7,703.50. The court will not consider that delivery in determining the amount of PACA trust benefits to which Continental may be entitled.

trumps that of nearly every other creditor, including secured lenders like Midwest. Indeed, the bank's security interest went only to property *belonging* to Gatziolis. By law, the money owed to Continental belonged not to Gatziolis, but to the PACA trust.

Midwest's only other argument on this point is that it is not required to treat the funds as PACA trust funds since Gatziolis did not treat the account like a trust account. The relevance of that allegation is not clear. If the bank is arguing that the money was not in trust, it is wrong. However Gatziolis *treated* the money, it was nonetheless in trust by statute. Continental has clearly demonstrated its likelihood of success in this matter.

### 4. Public Interest

Finally, the court must consider whether the public interest favors the issuance of the injunction. Quite clearly, it does. Congress enacted PACA in order to protect the public interest. As the court noted above, Congress intended the statute to prevent the harm to commerce which inevitably occurs when secured creditors, including secured lenders, dissipate monies which rightfully belong to, and should have been held in trust for produce sellers. 7 U.S.C. § 499e(c)(1). Yet defendants nonetheless insist that no such harm is threatened here. In this matter, the court defers to Congress' judgment regarding the public interest rather than defendants and Congress quite clearly has stated that the public interest lies in the protection of produce sellers such as Continental.

### Conclusion

Accordingly, the court finds that all proceeds or accounts receivable generated from the sale of those perishable agricultural commodities delivered to Gatziolis by Continental on April 10, 15, 18, 23, 26, and May 3, (for a total value of $66,404.50) and which are now in the possession of any

of the defendants to this action, are assets belonging to the statutory trust created by the 1984 Amendment to PACA.

Midwest Bank & Trust Co. is therefore ordered to pay into a separate, interest bearing account of a nationally chartered banking institution of the State of Illinois $64,404.50, pending satisfaction of defendants' trust obligations under 7 U.S.C. § 499e(c). Midwest shall deliver notice of such deposit to the court and to Continental within ten days of the date of this order.