USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1398

 HILLER CRANBERRY PRODUCTS, INC.,
 Plaintiff, Appellant,

 v.

 EDWARD M. KOPLOVSKY,
 KOPLOVSKY FOODS, INC., AND
 CLERMONT, INC.,
 Defendants, Appellees.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Edward F. Harrington, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

Wellford, Senior Circuit Judge,

 and Selya, Circuit Judge.

 _____________________

 Evan Slavitt, with whom Andrew A. Honegger, Benjamin G.
Robbins and Gadsby & Hannah LLP were on brief, for appellant.
 John J. Monaghan, with whom Gordon P. Katz, Paul G. Lannon and
Sherburne, Powers & Needham, P.C. were on brief, for appellees.

 ____________________

 January 4, 1999
 ____________________ WELLFORD, Senior Circuit Judge. We are confronted in
this case with difficult issues involving the interpretation of the
Perishable Agriculture Commodities Act of 1930, 7 U.S.C. 499a, etseq. ("PACA"). Plaintiff Hiller Cranberry Products, Inc.
("Hiller"), entered into a supply agreement (the "Supply
Agreement") with Koplovsky Foods, Inc. ("KFI"), which is owned by
Edward Koplovsky ("Koplovsky"), whereby Hiller was to sell KFI 33%
of its cranberry crop from 1996 through 1998. After the delivery
of about $7 million in cranberries in the fall of 1997, KFI failed
to pay approximately $4.4 million of the agreed purchase price. 
Hiller sued KFI, Clermont, Inc. ("Clermont"), and Koplovsky in
district court, alleging state-law breach of contract and
misrepresentation claims, and also a federal claim under PACA. 
Hiller sought a preliminary attachment, but the district court
found that only a partial attachment was appropriate. This is an
appeal from that determination. For the following reasons, we
reverse in part the district court's decision.
 BACKGROUND
 Hiller is in the business of selling cranberries, those
that are grown by the Hiller family and also those obtained from
other growers on Cape Cod in Massachusetts. Defendant KFI is a
Massachusetts company that purchases raw fruit from third-party
growers to be sold to processors for the production of, among other
things, fruit juice concentrate. Defendant Clermont is an Oregon
corporation with its principal place of business in Duxbury,
Massachusetts. Clermont processes raw produce into fruit juice
concentrate. For many years, Hiller has done business with
Edward M. Koplovsky, the president and sole shareholder of both KFI
and Clermont. Until 1996, business between Hiller and Koplovsky
occurred on a handshake basis.
 On or about September 10, 1996, KFI entered into the
written Supply Agreement to purchase one-third of Hiller's
Massachusetts-grown cranberries in 1996, 1997, and 1998. The
agreed-upon purchase price was $90 per barrel subject to certain
price adjustments. Under the Agreement, KFI agreed to pay 75% of
the purchase price within ten days of the invoice date, with the
remainder payable in two equal installments on January 1 and
February 1 of the following year. 
 Between September 25 and November 25, 1997, KFI accepted
delivery of nearly seven million dollars of Hiller's cranberries. 
KFI owes Hiller an outstanding balance of $4,225,455.58, plus
interest, on the cranberries. Hiller also agreed to clean some
cranberries for KFI, for which it charged $215,038.49. Thus, KFI,
now bankrupt, owes Hiller a total of $4,440,494.07.
 Upon the purchase of the cranberries from Hiller, KFI
immediately sold them to Clermont. Indeed, Koplovsky arranged for
shipment of the Hiller cranberries directly from Hiller to
Clermont's facilities in New York. Thus, KFI merely served as a
broker or conduit for Clermont. Clermont, in turn, immediately
pledged the Hiller cranberries to its lender to secure a multi-
million dollar loan. Clermont used only a fraction of the loan
proceeds to pay for the cranberries, and it used the rest to pay
Mr. Koplovsky and other creditors of Koplovsky and his companies.
 When it was apparent that no additional payment was
forthcoming from KFI, Hiller made demand for the immediate payment
of the outstanding balance due under the Agreement on or about
December 1, 1997. Despite alleged assurances from Koplovsky, KFI
failed to pay Hiller the outstanding balance. On or about
December 5, 1997, Hiller filed a Notice of Intent to Preserve Trust
Benefits with the United States Department of Agriculture and sent
a copy of the notice to KFI. That filing purported to set forth a
priority claim under PACA.
 On March 11, 1998, still having received no payment,
Hiller filed suit in district court against Koplovsky individually,
KFI, and Clermont for damages arising from the failure to pay the
approximately $4.4 million due for the cranberries and cranberry
services. Hiller sought a declaration that (1) very large
quantities of cranberries were subject to a PACA trust, (2) each
defendant had committed unfair and deceptive acts within the
meaning of PACA, and (3) that the defendants had breached the
fiduciary duties imposed by PACA. Hiller claimed, among other
things, that Clermont and Koplovsky were liable for KFI's debts
under PACA and as "alter egos" of KFI. In addition, Hiller claimed
that Koplovsky was engaged in a course of conduct calculated to
conceal assets and to deprive creditors of access to these assets. 
It alleged that Koplovsky transferred substantial real property,
including his cranberry bogs in Plymouth County, Massachusetts, to
various limited partnerships for a nominal sum ($1). Though
Koplovsky had explained the transfers as "estate planning," they
occurred in the midst of the cranberry price decline and during the
time KFI was failing to pay Hiller.
 At the outset of the lawsuit, the court granted Hiller an
ex parte temporary restraining order ("TRO") preventing the
defendants from disposing of any assets other than in the ordinary
course of business. On March 18, 1998, the parties stipulated to
a TRO, a preliminary injunction, and attachments against all the
defendants pending further order of the court. Later, the district
court heard oral arguments regarding Hiller's motion for the
issuance of a preliminary injunction and writ of attachments
against all of the defendants, and also regarding the potential
liability of Clermont and Koplovsky under PACA and as alter egos of
KFI. 
 On April 9, 1998, the district court issued an order
granting a preliminary injunction against KFI and continuing the
writs of attachment in the amount of $4,440,494.07 upon all the
assets of KFI. The order also enjoined Clermont as a "reach-and-
apply" defendant from paying any amount due to KFI and enjoined KFI
from receiving any of its approximately $10 million receivable from
Clermont. The court did not at that time grant Hiller a
preliminary injunction and a writ of attachment against Koplovsky
individually.
 In a memorandum dated April 17, 1998, the district court
addressed the potential liability of Clermont and Koplovsky
individually. Hiller Cranberry Prods., Inc. v. Koplovsky Foods,
Inc., 2 F. Supp. 2d 157 (D. Mass. 1998). First, the court found
that Hiller would not likely succeed on its PACA claim against
Clermont and Koplovsky, because the Supply Agreement allowed for
25% of the purchase price to be paid outside the thirty-day
limitation imposed by PACA. Id. at 160-61. Also, the district
court found that Hiller was not likely to succeed under an "alter
ego" theory against either Clermont or Koplovsky. Id. at 161-64. 
The district court specifically found that the evidence weighed
against piercing the corporate veil of KFI because there was no
evidence that corporate funds had actually been appropriated for
personal use, nor was there evidence that Hiller had been misled as
to the separate identities of the defendants. Id. Finally, the
district court determined that the complaint was not sufficiently
specific to support the state law claims, but that, even if the
complaint were sufficient, no federal subject matter jurisdiction
existed absent a valid claim under PACA. Id. at 164-65.
 Hiller appealed and simultaneously moved the district
court to stay its order pending appeal. The district court denied
the motion to stay but allowed a temporary stay so that Hiller
could request a stay from this circuit. We then granted a stay
pending an appeal, effectively reinstating the original attachments
and injunctions which precluded the defendants from transferring
assets except in the normal course of business. The defendants
subsequently filed an emergency motion for reconsideration of the
stay pending appeal. We denied that motion for reconsideration,
but ordered an expedited briefing schedule.
 ANALYSIS
 This court "will reverse a district court's denial of a
preliminary injunction only if the district court abused its
discretion." American Bd. of Psychology & Neurology, Inc. v.
Johnson-Powell, 129 F.3d 1, 2-3 (1st Cir. 1997) (citing Camel Hair
& Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799
F.2d 6, 12-13 (1st Cir. 1986)). The district court's decision to
grant or deny a preliminary injunction is reviewed by this court
"under a relatively deferential glass," because decisions to grant
or deny injunctive relief "can best be made by trial courts steeped
in the nuances of a case and mindful of the texture and scent of
the evidence." Independent Oil & Chem. Workers of Quincy, Inc. v.
Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988); K-
Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.
1989). "Absent clear error or other abuse of discretion, we will
not reverse a district court's denial of an injunction merely
because we would have been inclined to grant the injunction had we
heard the matter ourselves." American Bd. of Psychology, 129 F.3d
at 3. We review de novo, on the other hand, the district court's
construction of PACA and its other conclusions of law. See In re
Altabon Foods, Inc., 998 F.2d 718, 719 (9th Cir. 1993).
 As indicated above, Hiller sought a preliminary
injunction against the defendants restricting all transfer of
assets except in the ordinary course of business, and it also
sought a prejudgment attachment on the defendants' assets. In
order to obtain either form of relief, Hiller was obligated to
prove a likelihood of success on its various claims. In denying
Hiller the relief requested, the district court found that Hiller
would not likely succeed against Clermont or Koplovsky on its
claims under PACA, nor would it succeed against those defendants
under an "alter ego" theory. For the reasons explained hereunder,
we reverse those findings in part and remand to the district court
for further proceedings consistent with this opinion.
A. Likelihood of Success Against Clermont and Koplovsky Under PACA
 In 1984, Congress amended PACA by creating a statutory
trust over any goods, receivables, or proceeds from perishable
agricultural commodities until the buyer makes full payment. 7
U.S.C. 499e(c). The commodities, receivables, or proceeds "shall
be held by such commission merchant, dealer or broker in trust for
the benefit of all unpaid suppliers or sellers of such commodities
. . . until full payment of the sums owing in connection with such
transactions has been received by such unpaid suppliers, sellers,
or agents." 7 U.S.C. 499e(c)(2). In essence, PACA creates a
trust in favor of the seller of the unpaid goods which is superior
to the interest of the buyer's secured lender. See Sanzone-
Palisano Co. v. M. Seaman Enterprises, Inc., 986 F.2d 1010, 1012
(6th Cir. 1993). One result is that the res of the trust is
subject to the seller's lien and never becomes part of the buyer's
estate in the event of the buyer's bankruptcy. In re W.L. Bradley
Co., Inc., 75 B.R. 505, 512 (E.D. Pa. 1987).
 To preserve benefits under a PACA trust, a supplier of
perishable agricultural goods must deliver written notice of his
intent to preserve trust benefits to the debtor and to the United
States Secretary of Agriculture within a certain period of time. 
PACA establishes a ten-day time period within which a PACA seller
is to be paid (see 7 C.F.R. 46.2(aa)(5)), but parties may extend
the time period for payment by written agreement up to thirty days
without negating the PACA trust provisions. Any agreement
extending the payment period beyond thirty days generally
constitutes a waiver of rights under the PACA trust. Title 7
C.F.R. 46.46(e)(2) provides that "[t]he maximum time for payment
for a shipment to which a seller, supplier, or agent can agree and
still qualify for coverage under the trust is 30 days after receipt
and acceptance of the commodities." Id. 
 The circumstances in the instant case are unique, because
the Hiller Supply Agreement requires that 75% of the purchase price
be paid within ten days of acceptance, but allows for 25% of the
purchase price to be paid more than thirty days after acceptance. 
Whether an agreement providing for partial payment within the
thirty-day requirement and partial payment outside that time period
constitutes complete waiver of PACA protections is an issue of
first impression in the federal courts. Every other court that has
addressed the applicability of the PACA trust has dealt with totalamounts due under an agreement for delivery of perishables within
or outside the thirty-day requirement.
 The district court found that Hiller completely waived
all rights to trust protection under PACA by allowing for partial
payment beyond the thirty-day requirement. In reaching that
conclusion, the court relied on cases which have upheld the thirty-
day period as the maximum limit for payment. See In re Lombardo
Fruit and Produce Co., 12 F.3d 806, 809 (8th Cir. 1993); In re
Altabon Foods, Inc., 998 F.2d 718, 720 (9th Cir. 1993); In re Davis
Distributors, Inc., 861 F.2d 416, 417-18 (4th Cir. 1988); Mid-
Valley Produce Corp. v. 4-XXX Produce Corp., 819 F. Supp. 209, 211
(E.D.N.Y. 1993). Although the district court found this case to be
analogous to In re Lombardo and In re Altabon, it recognized that
the Supply Agreement in the instant case "var[ied] slightly" from
the contracts in the other cases because of this Agreement's
"partial payment" provision. The court looked to the regulations
which define "full payment promptly" as "specifying the period of
time for making payment without committing a violation of the act." 
7 C.F.R. 46.2(aa). The court reasoned that "'full payment
promptly' in connection with the 'maximum time for payment' in
Section 46.46(e)(2) indicates . . . that the entire payment must be
made within the thirty-day period. In order, thus, to be eligible
for the protection of the PACA statutory trust, the written
agreement must comply with PACA's maximum payment terms." Hiller
Cranberry Prods., Inc., 2 F. Supp. 2d at 161. 
 Hiller argues that it did not waive its rights under the
PACA trust, at least with respect to 75% of the contract price. 
Though there are no cases that have interpreted PACA so as to
provide for partial rights in this context, Hiller claims that the
remedial nature of the statute dictates that this court construe
the statute liberally in light of its remedial purpose to afford
trust protection to qualifying sellers. See Hull Co. v. Hauser's
Foods, Inc., 924 F.2d 777 (8th Cir. 1991); Continental Fruit Co. v.
Thomas J. Gatziolis & Co., 774 F. Supp. 449 (N.D. Ill. 1991); In re
Richmond Produce Co., 112 B.R. 364 (N.D. Cal. 1990). Hiller
contends that because the Supply Agreement provided for partialextension of the payment term, then Hiller's waiver, if any, of its
PACA trust rights should be viewed as only partial in nature.
 KFI responds that Hiller's positions are unfounded, and
that the thirty-day requirement for "full payment promptly" is
consistent with PACA's purposes. KFI points out that, in a related
proceeding, a district court in New York has adopted the district
court's analysis of the Supply Agreement in question and has
determined that no PACA protection is available to Hiller. Hiller
Cranberry Prods., Inc. v. Koplovsky, 5 F. Supp. 2d 89 (N.D.N.Y.
1998). In fact, the New York court did adopt the conclusion of the
district court in the instant case, but it relied almost entirely
on the same analysis. See id. at 91-92. Thus, we give that
decision little weight in reaching our ultimate conclusion.
 Congress created the availability of the PACA trust to
address burdens on commerce arising out of financing arrangements
between sellers and buyers of produce:
 [A] burden on commerce in perishable
 agricultural commodities is caused by
 financing arrangements under which
 commission merchants, dealers, or brokers,
 who have not made payment for perishable
 agricultural commodities purchased,
 contracted to be purchased, or otherwise
 handled by them on behalf of another
 person, encumber or give lenders a
 security interest in, such commodities, or
 on inventories of food or other products
 derived from such commodities, and any
 receivables or proceeds from the sale of
 such commodities or products, and . . .
 such arrangements are contrary to the
 public interest. This [Act] is intended
 to remedy such burden on commerce in
 perishable agricultural commodities and to
 protect the public interest.

7 U.S.C. 499e(c)(1). Thus, PACA is a remedial statute that
should be given a liberal construction in favor of promoting
Congress' intended purpose. See Hull, 924 F.2d at 782. Guided by
the general principle that we should construe this legislation in
a liberal manner, we consider whether PACA covers the Supply
Agreement in the instant case.
 As indicated above, the district court found this case to
be analogous to Lombardo and Altabon. In Lombardo, the parties had
entered into a written contract for the sale of produce providing
for the payment of the purchase price within PACA's thirty-day
limitation. In the parties' course of dealing, however, the seller
sometimes allowed the buyer to pay outside the thirty-day window. 
Thus, the buyer's secured creditor argued in bankruptcy proceedings
that the written agreement was a sham, and that by allowing the
buyer to pay outside the thirty days the seller lost its protection
under PACA. The issue before the court was whether the parties'
course of dealing was relevant in determining whether the seller
was entitled to trust protection. The court held that the contract
was valid and enforceable, even though the parties may not have
strictly operated under its terms. The court recognized, however,
that the seller could qualify for PACA protection with respect to
those transactions for which timely notice had been given. To
allow the seller in that case to recover for only those
transactions supported the sole purpose of PACA, which "is to
protect sellers of fresh produce for payment of their accounts from
the assets derived from the sale of the purchased produce in case
of bankruptcy, liquidation or other financial distress as against
the claims of secured creditors." Lombardo, 12 F.3d at 811.
 In Altabon, the seller and buyer of produce entered into
several contracts that provided for payment periods of 45-60 days. 
After the buyer filed for bankruptcy, the seller filed its notice
of its intent to seek trust protection under PACA. The buyer's
creditor filed an action seeking to determine the rights of the
parties, and argued that the seller could not avail itself of
PACA's trust protections because the contract between the parties
contained payment periods in excess of thirty days. The court
found that the thirty-day maximum imposed by Congress was
reasonable and was a permissible construction of the statute. 
Altabon, 998 F.2d at 720.
 We have no disagreement with the holdings in Lombardo or
Altabon. We do not find, however, the reasoning in those cases to
be determinative of the issue at bar. Similarly, we do not find
controlling other cases in which the thirty-day limitation was
upheld and enforced. See In re Davis Distributors, 861 F.2d 416
(4th Cir. 1988) (refusing to allow imposition of the PACA trust
provisions when contract allowed 60 days for payment); Mid-Valley
Produce Corp. v. 4-XXX Produce Corp., 819 F. Supp. 69 (E.D.N.Y.
1993) (finding that the written contract satisfied PACA's
provisions, despite the fact that the parties' course of dealing
may have allowed for a longer payment term).
 In each of the cases cited above, the courts focused on
the payment terms of the written contract between the parties and
found that the written agreement was controlling. In the instant
case, the terms of the Supply Agreement are clear -- 75% of the
payment is due within PACA's thirty-day limitation and 25% is due
outside that time period. The question is whether allowing for
such a payment scheme negates in total the statutory trust
provisions, or whether the PACA protection was preserved as to 75%
of the Agreement.
 We are persuaded that construction of PACA in a strict
and unbending fashion would erode the trust protections PACA was
meant to provide. The statutory language in PACA itself does not
address the situation in the instant case where a contract
explicitly provides for partial payments both within and outside
PACA's thirty-day requirement. Furthermore, there is no guiding
precedent directly on point. 
 Though there are no cases addressing the applicability of
PACA in a "part-payment" situation, there are a plethora of cases
that are instructive as to the purposes and intent of PACA. In
Hull Co. v. Hauser's Foods, Inc., 924 F.2d 777 (8th Cir. 1991), the
court sets out well the general purposes and operation of the Act:
 Congress . . . amended PACA in 1984 to
 provide additional protection to produce
 sellers. Congress recognized that, under
 the prevailing law, "sellers of fresh
 fruits and vegetables [were] unsecured
 creditors and receive[d] little protection
 in any suit for recovery of damages where
 a buyer ha[d] failed to make payment as
 required by the contract." H.R. Rep. at
 407. The statutory amendments make a
 legislative finding that financing
 arrangements made by commission merchant
 dealers and brokers who have not made
 payment for the goods deprive suppliers of
 payment and disserve the public interest.
 7 U.S.C. 499e(c)(1).

 Congress remedied this situation by
 amending PACA to make produce sellers'
 interests in the commodities superior to
 those of the buyers' secured creditors. 
 Under the amendments, buyers of perishable
 agricultural commodities are now required
 to hold the purchased commodities, and any
 resulting proceeds, in trust for the
 benefit of the sellers until the sellers
 are paid in full. 7 U.S.C. 499e(c)(2). 
 The statutory history indicates that the
 trust imposed on the assets of a buyer of
 perishable commodities related to those
 supplying credit on a short term basis. 
 In re Davis Distrib., Inc., 861 F.2d 416,
 417 (4th Cir. 1988). Congress left the
 specifics to the regulatory discretion of
 the USDA, including the task of
 prescribing the time "by which payment
 must be made." 7 U.S.C. 499e(c)(3).

Id. at 780, 781 (footnote omitted). The Eighth Circuit then
proceeded to the following conclusion about the construction of the
Act:
 [R]emedial legislation should be given
 a liberal construction to effectuate its
 statutory purpose. International
 Nutrition v. United States Dep't of
 Health, 676 F.2d 338, 341 (8th Cir. 1982);
 Tcherepnin v. Knight, 339 U.S. 332, 336,
 88 S. Ct. 548, 553, 19 L.Ed.2d 564 (1967). 
 Here, the PACA amendments serve to
 "provide suppliers and sellers of fruits
 and vegetables, or their agents, [with] a
 self-help tool that will enable them to
 protect themselves against the abnormal
 risk of losses resulting from slow-pay and
 no-pay practices by buyers or receivers of
 fruits and vegetables." 49 Fed.Reg.
 45,735, 45,737 (1984).

Id. at 782. We agree with Hull Co. and believe that plaintiff has
complied with PACA requirements as to 75% of the total contract;
our decision does not "thwart the remedial nature of the statute." 
Id. at 823; see also In re W.L. Bradley Co., Inc., 75 B.R. 505, 511
(E.D. Pa. 1987) (resolving ambiguities of PACA in favor of the
seller and being "guided by the general legislative intent to
establish increased production and an effective remedy for sellers,
suppliers and agents."); O'Day v. George Arokelian Farms, 536 F.2d
856, 857-58 (9th Cir. 1976) (stating that the principal purpose of
PACA is "to provide a practical remedy to small farmers and growers
who were vulnerable to the sharp practices of financially
irresponsible and unscrupulous brokers in perishable commodities."
(citation omitted)); Continental Fruit Co. v. Thomas J. Gatziolis
& Co., 774 F. Supp. 449 (N.D. Ill. 1991) ("PACA is a remedial
statute, and it is a long-established principal [sic] of statutory
construction that remedial statutes are to be construed
liberally."). 
 One of the factors that we deem to weigh in favor of
Hiller in this case is the clarity with which the Supply Agreement
provided that KFI was to pay 75% of the amount within the statutory
thirty days and then, upon this three-quarters fulfillment of its
written commitment, the remaining 25% was to be paid at some time
after thirty days. This arrangement constituted a partial waiver
of PACA rights by Hiller. The parties contemplated by their
Agreement that KFI was bound to pay 75% of the total price for the
cranberries within ten days. Consistent with the purposes of the
Act, we conclude that the arrangement under consideration was
equivalent to a sale of 75% of the cranberries with payment to be
made for these berries within ten days thereafter.
 In sum, we find that Hiller is eligible for PACA
protection with respect to 75% of the Supply Agreement. This
finding, however, does not conclude the relevant inquiry. Whether
Clermont is liable as a PACA broker, or whether Koplovsky is liable
as a PACA trustee, are issues that require further consideration by
the district court. The court should be mindful of the effect of
the imposition of the PACA trust:
 PACA establishes a statutory trust for
 the benefit of sellers and suppliers. 
 This trust arises from the moment
 perishable goods are delivered by the
 seller. An individual who is in the
 position to control the trust assets and
 who does not preserve them for the
 beneficiaries has breached a fiduciary
 duty, and is personally liable for that
 tortious act. This legal framework is to
 be distinguished from the piercing the
 veil doctrine, where the corporate form is
 disregarded because the individual has
 either a committed a fraud, or because the
 corporation is a "shell" being used by the
 individual shareholders to advance their
 own purely personal rather than corporate
 ends. Passalacqua Builders v. Resnick
 Developers, 933 F.2d 131 (2d Cir. 1991). 
 We find persuasive the reasoning holding a
 fiduciary liable for breach of trust under
 PACA.

 We recognize at the outset that a PACA
 trust in effect imposes liability on a
 trustee, whether a corporation or a
 controlling person of that corporation,
 who uses the trust assets for any purpose
 other than repayment of the supplier. 
 This includes use of the proceeds from the
 sale of perishables for legitimate
 business expenditures, such as the payment
 of rent, payroll, or utilities. Proceeds
 from the sale of perishables subject to
 PACA receive special treatment in other
 respects as well. Thus, a PACA
 beneficiary has priority over any secured
 creditor on the purchaser's commodity-
 related assets to the extent of the amount
 of his claim.

Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348
(S.D.N.Y. 1993) (citations omitted); see also In re Baird, 114 B.R.
198, 204 (9th Cir. 1990) (finding that "an officer who causes a
corporate trustee to commit a breach of trust causing loss to the
trust administered by the corporation is personally liable to the
beneficiaries for the loss"). 
 Thus, we reverse and remand to the district court to
assess the potential liability of either Clermont or Koplovsky
under PACA.
B. Likelihood of Success Against Clermont and Koplovsky on 
 Theories of Alter Ego and Piercing KFI's Corporate Veil
 Hiller argued that Clermont should be held liable as the
alter ego of KFI, and that the corporate veil of KFI should be
pierced to hold Koplovsky personally liable for KFI's debts. The
district court rejected these claims against Clermont and
Koplovsky, and concluded that Hiller was unlikely to succeed on
these "alter ego" theories. Consequently, the court dissolved the
injunctions against those defendants.
 Although the district court noted that "[i]t is
undisputed that Edward M. Koplovsky exercises pervasive control
over" KFI and Clermont, it found this factor insufficient to
support the alter ego theory, and declined to pierce the corporate
veil of either KFI or Clermont. The basis for this decision was
that there was "no failure to make clear which corporation was
taking action nor any failure to observe with care the corporate
form." As pointed out by the district court, the Hiller-KFI
Agreement specifically identified only KFI as the buyer, and
concluded with the following sentence, added by Koplovsky, which
amended a broader provision proposed by Hiller: "By executing this
Agreement, Clermont, Inc. and Edward M. Koplovsky, together with
any other entities under their control, hereby join in the
obligations of Buyer under Section 5.3 hereof [an agreement not to
solicit berries from any other source but Hiller]."
 We cannot find the facts as determined by the district
court to have been erroneous with respect to piercing the corporate
veil or alter ego liability. Neither can we conclude that the
district court misinterpreted Massachusetts law in this regard. A
recent Massachusetts case has cited controlling authority on these
issues and has concluded:
 In order for a court to disregard
 separate corporate entities, a plaintiff
 must meet a very high standard. American
 Home Assurance Co. v. Sport Maska, Inc.,
 808 F. Supp. 67, 73 (D. Mass. 1992). 
 Under Massachusetts law, disregarding
 separate corporate entities is the
 exception, not the rule,. . . . A court
 may pierce a corporate veil only when
 there is evidence of a "confused
 intermingling between corporate entities
 or where one corporation actively and
 directly participates in the activities of
 the second corporation, apparently
 exercising pervasive control." American
 Home, 808 F. Supp. at 73.

Dale v. H.B. Smith Co., Inc., 910 F. Supp. 14, 18 (D. Mass. 1995). 
In formulating the Supply Agreement, Hiller contracted to
incorporate Koplovsky and Clermont for the sole purpose of their
committing not to solicit berries from Hiller's independent grower
competitors during the term. Clermont and Koplovsky made clear
from the outset that they were not parties to the general Supply
Agreement.
 For these reasons and for the reasons stated by the
district court, we affirm the court's determination that Hiller
will not likely succeed against Clermont or Koplovsky pursuant to
"alter ego" theories of liability.
C. Likelihood of Success on Claims of Misrepresentation and
 Fraudulent Conveyance

 The district court ruled that there was no reasonable
likelihood of success against Koplovsky individually on the claims
of misrepresentation. As one basis for this determination, the
court noted that there was no federal subject matter jurisdiction
in this case because the PACA claim failed. As heretofore
determined, the district court was in error in reaching its
conclusion on the merits of the PACA claim. We have also remanded
for further consideration as to whether Koplovsky may be liable as
a trustee under the circumstances of this case. We deem the
misrepresentation claim to be related to the potentiality of
trustee liability. In discussing misrepresentation, we have
recognized that "the element of fraudulent intent may be proved by
showing that a defendant made a statement 'as of [his] own
knowledge' that was false." Metropolitan Life Ins. Co. v. Ditmore,
729 F.2d 1, 5 (1st Cir. 1984) (quoting Snyder v. Sperry &
Hutchinson Co., 333 N.E.2d 421, 428 (Mass. 1975)). Reliance upon
such statement might also be shown. In light of the circumstances,
we cannot at this juncture hold that Hiller has not alleged a
sufficient claim of misrepresentation against Koplovsky, whether
acting individually or as a trustee. Thus, we reverse the
dismissal of that claim and remand for its further consideration.
 We also remand to the district court Hiller's fraudulent
conveyance claim because we cannot agree that there may not be a
reasonable likelihood of success against Koplovsky individually on
one or more of those claims. The district court will, therefore,
on remand, hold a hearing to determine the issues remaining in
light of our opinion.
 In summary, we reverse the district court's determination
that Hiller is ineligible for PACA protection with respect to 75%
of the Supply Agreement. We remand to the district court for
further proceedings consistent with this opinion to determine the
likelihood of success against Clermont and Koplovsky under PACA. 
We affirm the district court's determination that Hiller is
unlikely to succeed on its claim that Clermont and Koplovsky are
liable under "alter ego" theories. We reverse, however, the
district court's dismissal of the claims of misrepresentation and
fraudulent conveyance and remand for further consideration in light
of this opinion.
 Under the circumstances, we deny defendant Koplovsky's
motion to dissolve the stay of the district court's order. Since
we remand certain issues involving Koplovsky to the district court,
defendant is not precluded from renewing his motion in that court
provided such relief is consistent with this opinion.

 Dissenting opinion follows SELYA, Circuit Judge (dissenting). As the majority
correctly notes, this appeal involves a difficult question of
statutory construction that constitutes an issue of first
impression in the federal courts. Because I read the statutory
imperative differently than my colleagues, I respectfully dissent.
 A core feature of the Perishable Agricultural Commodities
Act, 7 U.S.C. 499e(c)(1)-(4) (Supp. II 1996) (PACA), impresses a
trust in favor of the supplier of a covered agricultural commodity. 
Under the statute and the associated regulations promulgated by the
Secretary of Agriculture, that trust is superior to the interests
of a purchase-money lender (or any other security interest, for
that matter) as long as the transaction meets certain criteria and
the trust beneficiary takes certain specified actions. See 7
C.F.R. 46.46(e)(1)-(2) (1996). For example, to qualify for trust
protection, the terms of sale must call for payment within ten days
of the date of acceptance of a particular shipment. See 7 C.F.R.
 46.2(aa)(5) (1996). This period may be extended up to a maximum
of thirty days by an express written agreement executed prior to
the time of shipment, but cannot be extended for any more
protracted period. See 7 U.S.C. 499e(c)(3); 7 C.F.R.
 46.46(e)(2). The plaintiff does not challenge either the
efficacy of this regulation or the Secretary's authority to set the
thirty-day limit.
 The supply agreement at issue in this case is a hybrid: 
it requires that 75% of the purchase price for each shipment be
paid within ten days after acceptance of that shipment (i.e.,
within the PACA-prescribed payment period), but defers payment of
the remainder of the purchase price for more than thirty days
(i.e., to a date beyond the PACA-prescribed payment period). The
question, then, is whether the transaction is divisible for PACA
purposes. If so, the plaintiff, qua supplier, can claim the
benefit of the trust for that part of the payment (here, 75%) which
falls within the statutorily prescribed period. If, however, the
transaction is indivisible for PACA purposes, the statute would not
apply because "[t]he maximum time for payment for a shipment to
which a seller, supplier, or agent can agree and still qualify for
coverage under the [PACA] trust is 30 days after receipt and
acceptance of the commodities." 7 C.F.R. 46.46(e)(2).
 The majority today decides that individual transactions
are, in fact, divisible for this purpose. In my view, the contours
of the trust itself, as framed by the statute, do not seem elastic
enough to permit such a construction. Commodities sold pursuant to
the act "shall be held . . . in trust for the benefit of all unpaid
suppliers or sellers . . . until full payment of the sums owing in
connection with such transactions has been received." 7 U.S.C.
 499e(c)(2) (emphasis supplied). It is difficult for me to fathom
how a partial payment of the purchase price for a particular
shipment can constitute "full payment of sums owing in connection
with" that shipment. The majority's holding reads the concept of
"full payment" out of the statute. Basic canons of construction
prohibit courts from taking such liberties. See United States v.
Ven Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985) ("All words
and provisions of statutes are intended to have meaning and are to
be given effect, and no construction should be adopted which would
render statutory words or phrases meaningless, redundant or
superfluous.").
 The regulations reinforce the view that the statute
constructs an all-or-nothing paradigm. They unambiguously provide
that any circumstance that extends the payment period "for a
shipment" beyond thirty days constitutes a waiver of any
entitlement to the benefits of a PACA trust. See 7 C.F.R.
 46.46(e)(2) (declaring that "[t]he maximum time for payment for
a shipment to which a seller, supplier, or agent can agree and
still qualify for coverage under the [PACA] trust is 30 days after
receipt and acceptance of the commodities") (emphasis supplied). 
Courts ought to attribute to an undefined word in a statute or
regulation its ordinary usage. See Bailey v. United States, 516
U.S. 137, 145 (1995); United States v. Ron Pair Enters., Inc., 489
U.S. 235, 240-41 (1989). Under this approach, the regulation
determines PACA eligibility shipment by shipment. I simply do not
believe that this emphasis on the unitary conception of "a
shipment" is an awkward locution. The regulation, as I read it,
means exactly what it says and we ought to give effect to its
meaning. See Chevron U.S.A. Inc. v. National Resources Defense
Council, Inc., 467 U.S. 837, 844 (1984) ("We have long recognized
that considerable weight should be accorded to an executive
department's construction of a statutory scheme it is entrusted to
administer, and the principle of deference to administrative
interpretations.").
 In sum, the statute and the regulations clearly indicate
that transactions cannot be balkanized in order to obtain partial
PACA protection. The case law, while scanty, trends in the same
direction. Those courts that have addressed claims involving
payment terms of more than thirty days uniformly have held PACA
inapplicable on the ground that the thirty-day maximum period is to
be imposed as written. See In re Lombardo Fruit & Produce, 12 F.3d
806, 809 (8th Cir. 1994); In re Altabon Foods, Inc., 998 F.2d 718,
720 (9th Cir. 1993); In re Davis Distributors, Inc., 861 F.2d 416,
417-18 (4th Cir. 1988); Mid-Valley Produce Corp. v. 4-XXX Produce
Corp., 819 F. Supp. 209, 211 (E.D.N.Y. 1993). Today's decision
represents the first break in this seamless string of decisions. 
And although none of these cases is precisely on point, in
cumulation they furnish a persuasive set of analogs. The district
court embraced this analogy, see Hiller Cranberry Prods., Inc. v.
Koplovsky Foods, Inc., 2 F. Supp. 2d 157, 160-61 (D. Mass 1998),
and I believe it had good reason to do so.
 The majority overrides the logical import of the statute,
regulations, and case law on the ground that "PACA is a remedial
statute that should be given a liberal construction . . . ." Anteat 10. I have two problems with this usurpation. First, statutory
construction starts with the statutory text, read in light of
applicable regulations. See Riva v. Commonwealth of Mass., 61 F.3d
1003, 1007 (1st Cir. 1995); Strickland v. Commissioner, Me. Dep't
of Human Servs., 48 F.3d 12, 17 (1st Cir. 1995). Where, as here,
Congress has spoken to an issue with reasonable clarity, there is
little room left for judicial rumination. See Estate of Cowart v.
Nicklos Drilling Co., 505 U.S. 469, 475 (1992); Riva, 61 F.3d at
1007. Put another way, an inquiring court need not consult other
aids to construction when the words of a statute, as embellished by
the implementing regulations, neither create an ambiguity nor lead
to an unreasonable result. This is such a case and in such
circumstances, a euphemistic label cannot serve as a magic wand to
transform statutory meaning.
 Second, the majority misperceives Congress's purpose. In
enacting the PACA, Congress sought to strike a balance between the
interests of growers and the interests of those who purchase
perishable commodities from them. As written, the law in effect
provides that growers who sell their crops for cash retain a
security interest in the crops if payment is not made when due,
while those who extend significant credit to buyers forgo such
protection. This arrangement balances the seller's right to
payment against the buyer's need to finance its operations, thus
serving the public interest by alleviating the "burden on
commerce," 7 U.S.C. 499e(c)(1), with which PACA's progenitors
were primarily concerned. The remedy that PACA crafts for growers
is merely incidental to the overall regulatory purpose of the law.
 I need go no further. The short of it is that Congress
and the Secretary of Agriculture have made reasonably clear their
intention to treat each shipment of perishable goods as a unit for
the purpose of determining that shipment's eligibility for PACA
protection. By like token, Congress and the Secretary have made
"full payment" an integral part of the test for eligibility. By
permitting a grower to divide a single shipment into discrete units
in accordance with the terms of an installment sale, and divide the
payment accordingly, the majority here disrupts the symmetry of the
statutory scheme. I think that the court, in charting such a
course, invites untold mischief. Because I read the statute and
regulations differently and more literally I would reject the
plaintiff's appeal in its entirety.